584 F.2d 619
 8 Envtl. L. Rep. 20,699
 NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE,
Puerto Rican Civil Rights League, Inc., Older Americans
Coalition, Wilmington United Neighborhoods, Brandywine
Trinity United Methodist Church, on behalf of their members
and others similarly situated, and Sarah Bratcher, Raymond
W. Brown, Maria Galindez, for herself and as parent and
guardian for his minor children Reynaldo Galindez, and Pedro
Galindez, Milagro Quinones, Maria Miran, on behalf of
themselves and others similarly situated, Appellants,
v.
The MEDICAL CENTER, INC., David Mathews, U. S. Secretary of
Health, Education, and Welfare, Amos Burke, Director of the
Bureau of Comprehensive Health Planning and William C.
Gordon, Director of the Health Planning Council, Inc.
 No. 77-2369.
 United States Court of Appeals,
Third Circuit.
 Argued June 8, 1978.
Decided Aug. 18, 1978.
 
 Marilyn G. Rose, Christine B. Hickman, Center for Law and Social Policy, Washington, D. C., Louise Lander, New York City, Douglas A. Shachtman, Community Legal Aid, Wilmington, Del., Charles H. Toliver, IV, Alan Bernard Scher, Asst. City Sols., Wilmington, Del., for appellants.
 Barbara Allen Babcock, Asst. Atty. Gen., William Kanter, Barbara B. O'Malley, Attys., Dept. of Justice, Civ. Div., Litigation Section, Washington, D. C., for appellee.
 Rebecca L. Ross, Atty., Dept. of Justice, Civ. Div., Litigation Section, Washington, D. C., for appellee and Amos Burke.
 William M. Reinhart, U. S. Dept. of H.E.W., Washington, D. C., Edward F. Kafader, Wilmington, Del., for Amos Burke.
 Rodney M. Layton, Richards, Layton & Finger, Wilmington, Del., for The Wilmington Medical Center.
 Robert E. Kopp, Steven I. Frank, Washington, D. C., for Secretary, H.E.W.
 Patrick A. Parenteau, National Wildlife Federation, Washington, D. C., for amicus curiae.
 Before ROSENN, HUNTER and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 In response to the penetrating impact of man's activity on all elements of the natural environment, Congress declared it to be the continuing policy of the United States "to create and maintain conditions under which man and nature can exist in productive harmony." National Environmental Policy Act of 1969 ("NEPA" or "the Act") § 101(a), 42 U.S.C. § 4331(a) (1970). To implement this policy, Congress adopted the broad substantive and procedural requirements of NEPA and directed "to the fullest extent possible" that the laws and regulations of the federal government be administered consistent with environmental considerations. NEPA § 102, 42 U.S.C. § 4332 (1970).
 
 
 2
 Adoption of NEPA was intended to provide "a legislative mandate and a responsibility (for Federal officers) to consider the consequences of their actions on the environment."[1] Consequently, the Act requires all agencies of the Government to make a detailed statement on the environmental impact ("environmental impact statement" or "EIS") of every recommendation or report concerning Proposed legislation made by the agency. NEPA § 102(2) (C), 42 U.S.C. § 4332(2)(C) (1970). NEPA also requires those agencies to file impact statements in other situations as well. In recognition, however, of "the conflict between protection of the environment and advancement of other important national goals,"[2] the Act does not apply to all agency action; rather, its application is limited only to those "Major Federal actions" which significantly affect the quality of the human environment. NEPA § 102(2) (C), 42 U.S.C. § 4332(2)(C) (1970) (emphasis supplied).
 
 
 3
 In this case we must determine whether the action of the United States Department of Health, Education, and Welfare ("H.E.W." or "Secretary") in approving a capital expenditure by the Wilmington Medical Center ("WMC" or "Center"), a private non-profit hospital, constitutes "major Federal" action for purposes of NEPA and so requires H.E.W. to file an EIS. The district court concluded that the approval constituted minimal federal involvement with what is essentially private action. It therefore held that H.E.W. had no obligation to file an EIS. We agree and affirm.
 
 I. FACTS
 
 4
 WMC is the primary provider of hospital care to the citizens of New Castle County, Delaware. It presently operates three hospitals within the city of Wilmington the General Division, the Memorial Division, and the Delaware Division which have a capacity of 994 beds.[3] However, after several years of extensive planning, the Center now proposes to consolidate its operations to provide more efficient and broader health care delivery for the entire county. It therefore has adopted a plan, designated Plan Omega, which calls for an extensive restructuring of hospital services and the relocation of much of the Center's facilities. Plan Omega is an $88 million capital expenditure project the main elements of which are as follows: (1) the complete renovation of the Delaware Division, leaving it with a capacity of 250 beds, (2) the closing of the Memorial and General Divisions, and (3) the opening of a new $60 million, 800 bed tertiary care hospital in suburban Stanton, some eight miles from Wilmington. The ultimate effect of the plan would be to expand the total hospital care capacity of the county, improve health care delivery, and to reduce substantially the in-patient facilities of the city of Wilmington. The program would result in the transfer of most special pediatric, obstetric, tertiary care, and sophisticated services from Wilmington to Stanton.
 
 
 5
 In the spring of 1976, pursuant to section 1122 of the Social Security Act, 42 U.S.C. § 1320a-1 (Supp. V 1975) ("section 1122"), WMC sought capital expenditure approval of Plan Omega by the Secretary of H.E.W.[4] Following proper procedure under that section, WMC made an application to the Delaware Bureau of Comprehensive Health Planning and to a local health planning group for review of the relocation plan. Both organizations undertook studies to determine Delaware's need, as defined by its health care policy and standards set by the federal government, for expansion of WMC's facilities and expenditure of funds by it. The state and local agencies certified the WMC plan as necessary and the Secretary issued a section 1122 approval of Plan Omega in August of 1976. As a consequence of this approval, WMC was assured that the Secretary would not withhold payment of the capital component of WMC's charges to patients under medicare, medicaid, and child health programs on the ground that the component charge was the product of an unnecessary capital expenditure.[5]
 
 
 6
 Once it received section 1122 approval, WMC moved forward with Plan Omega;[6] it prepared to obtain financing for the project. With construction and the potential withdrawal of substantial health care services from Wilmington imminent, plaintiffs organizations and individuals representing the poor, the elderly, the handicapped, and several racial and ethnic minorities of Wilmington filed a lawsuit on September 10, 1976, approximately one month before WMC planned to issue construction bonds for the facility.[7] Plaintiffs contended that the construction of a large modern suburban hospital and the resultant reduction in services provided by the urban hospitals, would lead to the creation of a dual hospital system: the Stanton facility serving the white affluent suburban population, and the Wilmington facilities serving the class represented by the plaintiffs. Plaintiffs asserted that such a system would lead to the eventual deterioration of the quality of health care provided in Wilmington. Furthermore, they alleged that the removal of critical services to the suburban hospital would make the services virtually inaccessible to many of the residents of Wilmington.
 
 
 7
 Plaintiffs charged that implementation of Plan Omega would violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1970) and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1976). They asserted that the Secretary should have given specific consideration to those provisions prior to approving the plan under section 1122. Plaintiffs also charged that the relocation plan was in violation of NEPA, in that the Secretary issued an approval of the capital expenditure without first filing an environmental impact statement as required for all "major Federal actions significantly affecting the quality of the human environment." NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C) (1970). Plaintiffs therefore asked that Plan Omega be enjoined.
 
 
 8
 In response to these contentions, the district court directed H.E.W. "to determine whether Plan Omega violate(d) Title VI or § 504 (of the Rehabilitation Act)." N. A. A. C. P. v. Wilmington Medical Center, Inc., 426 F.Supp. 919, 925 (D.Del.1977). It then directed the Secretary "to reconsider his position" that NEPA was inapplicable to the section 1122 approval of Plan Omega. Id. at 926.
 
 
 9
 After receipt of this mandate, H.E.W. wrote the court and explained that it would treat plaintiffs' Title VI and Rehabilitation Act complaints as though they had been filed administratively. In so doing, the Secretary concluded that Plan Omega, as originally presented, would have violated the civil rights protections afforded under Title VI and the Rehabilitation Act. H.E.W. then undertook extensive negotiations with WMC and after several months, the agency and the Center signed an agreement pertaining to Plan Omega, encompassing civil rights assurances recommended by H.E.W.[8] In accordance with the district court's mandate, H.E.W. also filed a supplemental report with the court, reconsidering the Secretary's prior decision not to file an impact statement for the section 1122 approval. Although the agency determined that Plan Omega would have a significant impact on the quality of the human environment,[9] it concluded nonetheless that it was not required to file an EIS because its approval was not a "major Federal" action within the meaning of NEPA.
 
 
 10
 The plaintiffs returned to court once again and, on a motion for partial summary judgment, asked the district judge to declare the Secretary's section 1122 approval invalid for failure to comply with NEPA. In response, H.E.W. filed a cross-motion for partial summary judgment seeking approval of its actions. The district court granted the Government's motion, concluding that the Secretary's action under section 1122 was not "major Federal" action as the term was used in NEPA. N. A. A. C. P. v. Wilmington Medical Center, Inc., 436 F.Supp. 1194 (D.Del.1977). Plaintiffs appeal from the judgment entered by the district court and ask us to reverse.[10] We decline to do so.
 
 II. REQUIREMENTS OF NEPA
 
 11
 NEPA provides in pertinent part that:to the fullest extent possible . . . all agencies of the Federal Government shall
 
 
 12
 (C) include in every recommendation or report on proposals for legislation and other Major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on
 
 
 13
 (i) the environmental impact of the proposed action,
 
 
 14
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 
 
 15
 (iii) alternatives to the proposed action,
 
 
 16
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 
 
 17
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 
 
 18
 NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C) (1970) (emphasis supplied).[11]
 
 
 19
 NEPA thus requires an EIS only for "major Federal actions significantly affecting the quality of the human environment." As a preliminary matter, therefore, we must address the question of the precise meaning of this phrase. We believe that the phrase may be read in one of two ways: either it requires a unitary standard, compelling a court to conclude that a federal action is major so long as the action relates to a substantial impact on the human environment, or it requires a dual standard, compelling a court to determine not only the environmental impact of an action but also whether the agency action itself is of a major scope. Plaintiffs ask us to adopt the former approach to NEPA; H.E.W. advocates the latter reading of the EIS requirement.
 
 
 20
 In support of the unitary approach, plaintiffs cite Minnesota Public Interest Research Group v. Butz, 498 F.2d 1314 (8th Cir. 1974), in which the Eighth Circuit stated that separation
 
 
 21
 of the magnitude of federal action from its impact on the environment (would do) little to foster the purposes of (NEPA), I. e., to "attain the widest range of beneficial uses of the environment without degradation, risk to health and safety, or other undesirable and unintended circumstances." . . . By bifurcating the statutory language, it would be possible to speak of a "minor federal action significantly affecting the quality of the human environment," and to hold NEPA inapplicable to such an action. Yet if the action has a significant effect, it is the intent of NEPA that it should be the subject of the detailed consideration mandated by NEPA; the activities of federal agencies cannot be isolated from their impact upon the environment.
 
 
 22
 Minnesota Public Interest Research Group v. Butz, supra, 498 F.2d at 1321-22 (footnote omitted); See City of Davis v. Coleman, 521 F.2d 661, 673 n.15 (9th Cir. 1975); Wyoming Outdoor Coordinating Council v. Butz, 484 F.2d 1244 (10th Cir. 1973).
 
 
 23
 The Second Circuit has taken a contrary approach, stating that "major Federal" action and significant effect "are different and . . . the responsible agency has the authority to make its own threshold determination as to each in deciding whether an impact statement is necessary." Hanly v. Mitchell, 460 F.2d 640, 644 (2d Cir.), Cert. denied, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972); See Scherr v. Volpe, 466 F.2d 1027, 1032-33 (7th Cir. 1972); Comment, Scenic Rivers, supra, 124 U.Pa.L.Rev. 260. Following this line, H.E.W. strongly urges us to adopt the dual standard.
 
 
 24
 In resolving the conflict between H.E.W.'s position and that taken by the plaintiffs, we believe the dual standard requiring separate thresholds of proof for "significance" and "major" to be a preferable frame of analysis for the EIS requirement. First, the two-pronged approach follows the statutory language more closely than the unitary approach; second, the unitary approach would give virtually no effect to the word "major," and thus would run counter to the requirement that a court give effect to all words of a statute when construing it; and third, the Government reasonably could have concluded that a minimal federal relationship to a project having an environmental impact would not warrant expenditure of scarce resources and critical time for preparation of a needless impact statement. See N. A. A. C. P. v. Wilmington Medical Center, Inc., supra, 436 F.Supp. at 1199.
 
 
 25
 We are reinforced in our decision to adopt the dual standard by the regulations enacted by the Council on Environmental Quality which recognize separate proof "thresholds" for "major" and "significant."[12] We therefore approve the Council's guidelines and the approach suggested by H.E.W. and hold that an agency must prepare an EIS only if (1) it has undertaken a "major Federal" action and (2) that action will significantly affect the quality of the human environment.
 
 
 26
 III. SCOPE OF FEDERAL ACTION UNDER SECTION 1122
 
 
 27
 Section 1122 is a complex statutory provision backed with detailed regulations. It has as its dual purpose (a) the containment of hospital costs by limiting federal reimbursements covering capital expenditures for health care to those expenditures deemed necessary by the state and (b) the encouragement of rational health planning by the states.
 
 
 28
 The purpose of this section (1122) is to assure that Federal funds appropriated (for medicare, medicaid, and child health programs) are not used to support unnecessary capital expenditures made by or on behalf of health care facilities or health maintenance organizations which are reimbursed under any of such (programs) and that, to the extent possible, reimbursement under such (programs) shall support planning activities with respect to health services and facilities in the various States.
 
 
 29
 42 U.S.C. § 1320a-1(a) (Supp. V 1975).
 
 
 30
 To implement this goal, section 1122 establishes procedures whereby the primary responsibility for assessing a proposed capital expenditure would be made by a state agency according to the state's health care needs. Section 1122 provides for the following features:
 
 
 31
 (1) The Secretary is directed to enter into voluntary agreements with any state willing and able to participate in the program. Under such agreements, the state is obligated to designate an agency to administer applications for approvals of capital expenditures. 42 U.S.C. § 1320a-1(b) (Supp. V 1975);
 
 
 32
 (2) The federal government is authorized to pay the costs incurred by the designated state agency in carrying out its duties under the section. 42 U.S.C. § 1320a-1(c) (Supp. V 1975);(3) The state agency is given the obligation to assess any capital expenditure proposed by an organization receiving federal payments. The assessment calls for the state agency to determine if the capital expenditure is consistent with the state's need for adequate health care in the area. The agency is charged with making findings concerning the state's need for the facilities to the Secretary within sixty days of the receipt of the application for the proposed expenditure. 42 C.F.R. § 100.104-(a)(1)-(2) (1976);
 
 
 33
 (4) In the event that the state agency decides that the capital expenditure is unnecessary, it must take the following action: (a) submit its findings and recommendations to the Secretary; (b) receive from local health planning agencies their findings on the proposed expenditure and send them to the Secretary; and (c) establish appeals procedures for the proponent of the expenditure. 42 U.S.C. § 1320a-1(b) (Supp. V 1975); and
 
 
 34
 (5) If the agency either did not receive proper notice of the capital expenditure or, if it did and it notified the proponent of the expenditure of a negative finding as to need, the Secretary may decide either (1) not to allocate future capital costs for the proposed project under medicare, medicaid, and child health programs, or (2) to override the state's recommendation. The Secretary may follow the second option only if a refusal to reimburse capital costs would affect adversely the efforts of the proponent health care provider to provide adequate care and that health care provider was found, to the Secretary's satisfaction, to be capable of providing efficient and adequate health care. 42 U.S.C. § 1320a-1(d)(2) (Supp. V 1975).
 
 
 35
 Neither the statute nor the regulations explicitly describe the duties of the Secretary when the designated state agency approves a capital expenditure. H.E.W. asserts that in such a case, it has no discretion to take environmental considerations into effect and it is required to approve the proposed capital expenditure. Our understanding of section 1122 is in accord with that of the Secretary and in accord with the perceptions of the district court as well.
 
 
 36
 If (a section 1122) application has received complete approval when it reaches the Secretary, he then performs the ministerial act of assuring that the proper procedure has been followed. . . . The Secretary, however, has no discretion as to whether the proposed expenditures are unwise. . . .
 
 
 37
 N. A. A. C. P. v. Wilmington Medical Center, Inc., supra, 436 F.Supp. at 1198 (footnotes omitted).
 
 
 38
 We agree with the district court's holding that H.E.W. lacks discretionary power to override the decision of the designated state agency once the state agency has approved, by proper procedure, a capital expenditure proposal. We therefore conclude that the Secretary has mere ministerial duties in a state approved section 1122 application.[13]
 
 
 39
 IV. APPLICATION OF NEPA'S REQUIREMENTS TO FEDERAL ACTION
 
 UNDER SECTION 1122
 
 40
 The sole issue confronting this Court is whether "the Secretary's limited role in the implementation of Plan Omega under the provisions of § 1122 of the Social Security Act . . . constitutes 'major Federal action significantly affecting the quality of the human environment' as that phrase is found in (NEPA)." N. A. A. C. P. v. Wilmington Medical Center, Inc., supra, 436 F.Supp. at 1196. As earlier outlined, this means that the Secretary must file an EIS only if the agency's approval of a capital expenditure is a "major Federal" action and the approval affects significantly the quality of the human environment. It has been conceded that Plan Omega will have a substantial environmental impact.[14] Thus, the critical question we confront in this appeal is whether H.E.W.'s section 1122 approval constitutes "major Federal" action within the meaning of NEPA.
 
 
 41
 A court must make two determinations when assessing agency action under NEPA's standards: first, whether the agency has undertaken any "action" at all within the meaning of the Act, and second, whether the agency's action is " major."
 
 
 42
 (T)here is "Federal action" within the meaning of the statute not only when an agency proposes to build a facility itself, . . . but also whenever an agency makes a decision which permits action by other parties which will affect the quality of the environment. . . . NEPA's impact statement procedure has been held to apply where a federal agency approves a lease of land to private parties, . . . grants licenses and permits to private parties, . . . or approves and funds state highway projects. . . . In each of these instances the federal agency took action affecting the environment in the sense that the agency made a decision which permitted some other party private or governmental to take action affecting the environment.
 
 
 43
 Scientists' Institute for Public Information, Inc. v. A. E. C., 156 U.S.App.D.C. 395, 404-405, 481 F.2d 1079, 1088-89 (1973) (Wright, J.) (footnotes omitted).
 
 
 44
 We have serious doubts whether the Secretary's ministerial approval under section 1122 constitutes "action" as defined above.[15] For the purposes of this appeal, however, we assume as did the district court, See N. A. A. C. P. v. Wilmington Medical Center, Inc., supra, 436 F.Supp. at 1202 n. 32, that H.E.W. has taken "action" in regard to Plan Omega. But, Chief Judge Latchum held that the Secretary's section 1122 approval action was not " major" because (1) the agency only had ministerial responsibilities relating to the relocation plan, (2) the agency gave no direct financial aid to the project, and (3) the overall federal involvement with the project was not sufficient to turn essentially private action into federal action. N. A. A. C. P. v. Wilmington Medical Center, Inc., supra, 436 F.Supp. at 1200-03.
 
 
 45
 Plaintiffs assert on appeal that the district court committed reversible error by failing to find the Secretary's approval action under section 1122 "major" and by refusing to order the Secretary to file an EIS. They argue primarily that a lack of agency discretion is irrelevant in assessing whether the agency's actions are "major" within NEPA. Rather, plaintiffs contend that because the Secretary's approval "enabled" WMC to go forward with Plan Omega, because WMC will eventually receive vast amounts of federal financial assistance under medicare, medicaid, and child health programs, and because Plan Omega is so intertwined with an extensive federal presence, the Secretary's actions under section 1122 must be viewed as major. We disagree.
 
 
 46
 As stated previously, See Part III, Supra, the Secretary's actions under section 1122 are severely limited when the state agency has approved a hospital capital expenditure application. The statute does not allow the Secretary to reconsider the merits of a proposed project after approval by the state and local planning agencies. From this, the district court concluded that it was "difficult to believe that Congress intended to append environmental responsibilities to the Secretary's ministerial role." N. A. A. C. P. v. Wilmington Medical Center, Inc., supra, 436 F.Supp. at 1201. The court indicated that the decision not to require an EIS in a section 1122 case would not be inconsistent with the policy of NEPA requiring that "federal decision makers consider the environmental consequences of their decisions," because section 1122 does not give the federal agency authority to alter its decision on environmental grounds. Id. at 1202; See n. 1, Supra.
 
 
 47
 Plaintiffs assert that the district court misconceived the requirements of NEPA; that even agencies lacking discretion must file an EIS, if as a factual matter, a proposed project with environmental consequences would not be undertaken "but for" those actions. We believe that neither the Council on Environmental Quality regulations nor the cases support plaintiffs' theory.
 
 
 48
 The Council regulations indicate that an EIS will be required only for certain agency actions, including, but not limited to,
 
 
 49
 (n)ew and continuing projects and program activities: Directly undertaken by Federal agencies, or supported in whole or in part through Federal contracts, grants, subsidies, loans, or other forms of funding assistance (except where such assistance is solely in the form of general revenue sharing funds distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 1221 et seq. with No Federal agency control over the use of such funds); or involving a Federal lease, permit license, certificate or Other entitlement for use.
 
 
 50
 40 C.F.R. § 1500.5(a)(2) (1977) (emphasis supplied); See 40 C.F.R. § 1500.6(c) (1977).
 
 
 51
 We believe that the Council's regulations outline three general classes of agency action requiring a federal agency to prepare an environmental impact statement: first, the agency must prepare a statement for any project directly undertaken by it; second, the agency must prepare a statement for any project it supports, in whole or in part, by contract, grant, subsidy, loan, or other form of financial assistance; and third, the agency must prepare a statement for any project involving a federal lease, permit license, certificate or other entitlement for use. There can be no doubt that H.E.W. has not in any way directly undertaken Plan Omega. Plaintiffs assert, however, that H.E.W.'s approval under section 1122, taken in conjunction with federal aid to patients for services under medicare, medicaid, and child health programs, is sufficiently analogous to either federal financial support of a program or federal entitlement to use as to require an EIS for a section 1122 approval. We believe that the section 1122 procedure, though financially related to WMC and perhaps factually facilitating the implementing of Plan Omega, does not reach the level of "funding assistance" or "entitlement for use" warranting application of NEPA.
 
 
 52
 The record in this case indicates that WMC receives more than one third of its revenues from the federal government as reimbursement for services to patients under medicare, medicaid, and child health programs. Furthermore, the parties have stipulated that without this assistance WMC could not feasibly operate its facilities. Thus approval of Plan Omega under section 1122 has financial implications, for it assures WMC that it will not lose the capital cost component of its reimbursement from the Government under the programs enumerated above. Moreover, plaintiffs maintain that it has been conceded that "but for" the section 1122 approval, Plan Omega would not be implemented.[16] From these facts, plaintiffs ask us to conclude that the Secretary's involvement with section 1122 approval of Plan Omega is a "major Federal" action.
 
 
 53
 The cases decided under NEPA have required an EIS when massive federal financial assistance has been given to a project. See, e. g., City of Davis v. Coleman, supra, 521 F.2d 661 (federal financial participation in the construction of highway system); Monroe County Council, Inc. v. Volpe, 472 F.2d 693 (2d Cir. 1972) (federal financial assistance of 60% Of proposed highway costs of which the viaduct section alone would exceed $14,000,000); Scherr v. Volpe, 466 F.2d 1027 (7th Cir. 1972) (federal financial aid for the extensive construction of two-lane conventional highway into a four-lane freeway). Such cases, as the regulations make clear, are well within the policy of NEPA covering "the major Federal" actions. A private or state operated project which has a significant environmental impact and depends directly upon funds provided by the federal government, takes on federal characteristics because of the federal financial support of the program. Accordingly, the federal government becomes accountable under NEPA for its actions.
 
 
 54
 A section 1122 approval, however, does not require the federal government to expend any funds on the hospital project. Thus, it differs from a construction grant under the Hill-Burton program, 42 U.S.C. § 291 (1970). Approval under section 1122 merely assures a health care provider that future medical payments under medicare, medicaid, or child health programs will not be reduced on account of an unnecessary capital expenditure. Section 1122 approval does not amount to any direct financial commitment to the construction of a facility; nor does it guarantee payment after completion. Federal health care payments may still be withheld in the future if the hospital does not comply with its on-going obligations under federal regulations to its patients. Moreover, as federal payments covering construction costs may be paid even when the health care provider does not choose preliminarily to make a section 1122 application, it is difficult to attribute federal payments for future patient services to any section 1122 action. Without further federal involvement, a section 1122 approval cannot of itself be sufficient to convert a private hospital project into a "major Federal" action.[17]
 
 
 55
 Plaintiffs argue that section 1122 approval procedures must not be viewed in the abstract, but instead must be considered in the context of a massive federal presence which eventually will yield funds to enable effectuation of Plan Omega. Plaintiffs contend that "but for" section 1122 approval, there would be no relocation plan.
 
 
 56
 The commitment of the federal government to reimburse a hospital for patient care neither indicates a massive federal presence nor connotes "major Federal" action under NEPA. Federal reimbursement for services under medicare, medicaid, and child health programs may ensure feasibility of WMC's operations. However, such an obligation by the federal government to patients under its health care programs is hardly sufficient to convert structured private action into significant federal action. Payments to WMC under federal programs have been taking place prior to the Plan Omega proposal; they will take place in the future regardless of whether the plan is completed successfully, so long as WMC fulfills its obligations under the health care programs. Also pivotal is that reimbursement by the federal government for patient services provided by WMC has no nexus to WMC action that may affect the environment Plan Omega. Federal payment under various health care programs, though paid directly to the health care provider as a means of assuring care, are essentially reimbursements made for the benefit of the individual patients receiving federal aid. Had H.E.W. chosen to pay the patients directly, instead of making payments to the hospital for those patients, there would have been no federal involvement with Plan Omega. The Government's choice of the method of payment should not dictate a different result under NEPA.[18]
 
 
 57
 Plaintiffs assert that even though the federal payments made by H.E.W. and the section 1122 approval given by the Secretary were not intended directly to finance Plan Omega, they nonetheless constitute federal action because they will enable WMC to implement the plan. We believe that plaintiffs' argument cannot withstand close scrutiny. Cases involving enablement entail discretionary decisions of federal agencies which serve as conditions precedent to actions taken by private entities. In such cases, the federal action may be considered major because the "agency (has) made a decision which Permitted some other party" to take an action affecting the environment. Scientists' Institute for Public Information, Inc. v. A. E. C., supra, 156 U.S.App.D.C. at 405, 481 F.2d at 1089 (emphasis supplied). In other words, the agency's action under the statute must be a legal precondition which authorizes the other party to proceed with action which will affect the environment. The Council on Environmental Quality regulations make even clearer that the federal enablement must be Required before the private party may act. Such "action" involves "a Federal lease, permit, license, certificate or other Entitlement for use," but does not extend to Government action which amounts to less than a legal precondition. The cases confirm this understanding of "enablement."
 
 
 58
 In Minnesota Public Interest Research Group v. Butz, supra, the Department of Agriculture was required to file an EIS because of its approval of logging operations by a private company. However, the proof demonstrated that the agency had a responsibility greater than the ministerial act of approval. It had also extended logging contracts, modified contracts, and had a financial interest in the lumber acquired. The actions of the agency enabled the logging operations in the area to be undertaken, but most significantly, the agency was Legally obligated by contract to give its approval to a project before that project could be undertaken. See 498 F.2d at 1322-23. The instant case is quite different; no legal requirement for obtaining a section 1122 approval exists and H.E.W. has no operational control over the hospital.
 
 
 59
 Other cases are distinguishable as well. See, e. g., National Forest Preservation Group v. Butz, 485 F.2d 408 (9th Cir. 1973) (federal government exchanged certain park lands for those owned by a private enterprise, enabling the private enterprise to exercise impact on the lands); Scientists' Institute for Public Information, Inc. v. A. E. C., supra, (Atomic Energy Commission required to file an EIS for its program studying fast breeder nuclear reactor as it would be the agency legally required to give approval prior to construction of a nuclear plant); Davis v. Morton, 469 F.2d 593, 596 (10th Cir. 1972) (government agency required by law to approve a lease on Indian property in order to have a valid lease; ordered to file an EIS for without its approval the lease would be invalid as a matter of law); Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1971) (Department of Transportation ordered to file an EIS where federal approval of highway construction plans legally required in order to qualify for federal funding).
 
 
 60
 Each of these cases indicates that when a federal agency gives a legally necessary discretionary approval enabling another significantly to impact on the environment, the agency may be required to file an EIS. When the agency has discretion in its "enabling" decision to consider environmental consequences and that decision forms the legal predicate for another party's impact on the environment, the filing of an EIS by the agency is justifiable under NEPA policy, for the agency has significantly contributed to environmental impact. Plaintiffs maintain, however, that even when the agency has no discretion to prevent the other's action because of environmental impact, an EIS should be required nonetheless so long as the federal action in any sense enables the other party's action. In support of this theory plaintiffs cite several cases in which an agency with little discretion was ordered to file an environmental impact statement. We believe those cases are distinguishable.
 
 
 61
 In Scottsdale Mall v. State of Indiana, 549 F.2d 484 (7th Cir. 1977), Cert. denied, 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750 (1978), plaintiff, a shopping center, attempted to enjoin highway construction being undertaken by the State of Indiana. Indiana at that time was receiving federal funding for its project, but in response to the lawsuit, it withdrew from the federal program. Nonetheless, the court required the Department of Transportation to file an EIS. The record, however, showed that the state's road had been planned by the federal government and that the federal agency had been involved in the programming, location selection, design, preliminary engineering, and right of way acquisition for the project. This substantial federal presence was sufficient to require an EIS, even though the agency had no further discretionary responsibility. In this case, H.E.W. has not participated in the conceptualizing, designing, planning, and programming of Plan Omega. Its presence is minimal.
 
 
 62
 Of similar effect is Ely v. Velde, 451 F.2d 1130 (4th Cir. 1971). In that case, plaintiff moved to enjoin the construction by the State of Virginia of a penal facility in an area containing historical sites. The court required the Law Enforcement Assistance Administration to file an EIS for the project. LEAA had approved the state's construction plan and although its review of the plan was severely limited, and it apparently had only limited discretion to disapprove the expenditure, an EIS was ordered. However, the record made clear that the agency had undertaken other action as well as its narrow approval, including giving direct financial assistance to the state to complete the building. H.E.W. has given no such aid in this case.
 
 
 63
 Plaintiffs also cite Scenic Rivers Ass'n of Oklahoma v. Lynn, 520 F.2d 240 (10th Cir. 1975), a case in which the Tenth Circuit faced a question similar to that posed by this appeal. In that case, land developers were required to file reports with the Department of Housing and Urban Development for approval of projects constructed along scenic rivers. The Secretary was required to approve such applications within thirty days or they would be approved automatically, unless procedurally defective. Even with this limited discretion and no other federal involvement, an EIS was ordered. We believe that this decision is questionable at best, See Comment, Scenic Rivers, supra, and in view of its subsequent reversal by the Supreme Court on other grounds, Flint Ridge Development Co. v. Scenic Rivers Ass'n of Oklahoma, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976) (NEPA not applicable to a scenic rivers application) we believe its precedential value diminished. In any event, we reject its reasoning.
 
 
 64
 We believe that analysis of these cases reveals that in order to determine if an agency's role constitutes major action under NEPA, a court must focus its inquiry on whether the action of the federal agency demonstrates a federal "responsibility" for the action. See Comment, Scenic Rivers, supra,124 U.Pa.L.Rev. 266. When the agency "enables" another to impact on the environment, the court must ascertain whether the agency action is a legal requirement for the other party to affect the environment and whether the agency has any discretion to take environmental considerations into account before acting. See 40 C.F.R. § 1500.5(a)(2) (1977); Monroe County Conservation Council, Inc. v. Volpe, supra, 472 F.2d at 697 ("The primary purpose of the impact statement is to compel federal agencies to give serious weight to environmental factors in making Discretionary choices") (emphasis supplied). When the agency may act to prevent the environmental consequences of another's actions, the latter's action may be fairly considered that of the agency.
 
 
 65
 Even in a case in which the agency has no discretion, federal responsibility may be found if that agency has given substantial assistance, financial or otherwise, to the program impacting on the environment. Such substantial involvement appropriately subjects the agency to the provisions of NEPA.
 
 
 66
 We believe that NEPA implicitly and thoughtfully recognizes a need for drawing lines between the major and minor actions of federal agencies. Those lines must be drawn to append environmental responsibility directly on federal decision makers or agencies that commit substantial federal resources to projects significantly affecting the environment. Requiring an EIS for anything less would needlessly hinder the Government's ability to carry on its myriad programs and responsibilities in which it assists, informs, monitors, and reacts to activities of individuals, organizations, and states, but in which the Government plays an insubstantial role.
 
 V. CONCLUSION
 
 67
 A close reading of NEPA, its regulations, and the cases interpreting its requirements convinces us that H.E.W. is not required to file an EIS for its approval of projects under section 1122 unless the agency has made direct financial commitments to the proposed private project which will affect significantly the quality of the human environment or unless the agency has participated directly in the planning or promotion of that project. In the instant case, H.E.W. has provided no direct support, financial or otherwise, to the development of Plan Omega. Its sole participation in the plan was to give ministerial approval to the capital expenditure proposal an expenditure that the secretary was required to approve because it was authorized as necessary by the designated state planning agency. Section 1122 approval, even if it "enabled" implementation of Plan Omega, does not require the filing of an EIS because the agency's approval was not legally required and the agency was not empowered to consider environmental effects in its review of a state's recommendation. Moreover, there is no nexus between the section 1122 federal approval of the WMC private project and that project's impact on the environment.
 
 
 68
 For the reasons expressed above, the judgment of the district court will be affirmed.[19]
 
 
 69
 A. LEON HIGGINBOTHAM, Circuit Judge, concurring.
 
 
 70
 I concur solely with the result and final conclusion of the majority, but I disagree quite strongly with much of their analysis on the relevant principles of law. While it is tempting to take time to write a line-by-line response to the majority's view, I have concluded that the delays inherent in writing such an opinion would not be in the best interest of the entire Delaware community which has been planning a restructuring of their hospital system for years and litigating this very matter in the federal courts for almost two years without a brick having been laid or ultimate financing having been approved. In short, I agree that after a favorable finding was made by the prerequisite state agency, the Secretary's role in approving the proposed capital expenditure for Plan Omega was merely ministerial and involved no discretion to disallow such expenditures.
 
 
 71
 The determination of whether a federal agency has engaged in "major federal action," when a non-federal party is involved (be it by issuing a permit or license; granting funds, loans or mortgage guarantees; approving or disapproving a state program; or contracting to provide necessary resources for a non-federal program) requires a threshold determination of whether there has been the requisite "federal action." The resolution of whether there has been or will be "action" within the meaning of NEPA must necessarily revolve around the issue of discretion: Does the federal agency have a decision to make which can be affected by environmental considerations? This definition of "action" conforms with the purpose of NEPA and developing case law in the area.
 
 
 72
 A requirement that the federal agency perform a discretionary role in order to find "action" subject to NEPA considerations has a firm basis in 42 U.S.C. § 4332. Section 4332(2)(A) and (B) emphasize that NEPA policy considerations must have a role in federal planning and decision making. In Transcontinental Gas Pipeline Corp. v. Hackensack Meadow Development Corp., 464 F.2d 1358, 1365 (3rd Cir. 1972), Cert. denied, 409 U.S. 1118, 93 S.Ct. 909, 34 L.Ed.2d 701 (1973), this court recognized the basic NEPA goal that
 
 
 73
 . . . all executive and administrative agencies give good faith, careful and informed consideration to environmental values during the course of their decision making processes.
 
 
 74
 Accordingly, when the federal action does not involve decision making processes, there is no basis for believing that Congress intended the federal agency to file an EIS; NEPA is inapplicable when there is no decision to be made by the relevant federal agency.
 
 
 75
 Few courts have had to address the issue raised most precisely in this case: Are ministerial actions of federal agencies within NEPA's ambit? Of those cases brought to this court's attention by the parties or otherwise, all but one has required a finding of discretionary authority on the part of the federal agency before applying the EIS requirement.[1] As the district court below correctly found:
 
 
 76
 If the application has received complete approval when it reaches the Secretary, he then performs the ministerial act of assuring that the proper procedure has been followed. The Secretary, however, has no discretion as to whether the proposed expenditures are unwise. (footnotes omitted).
 
 
 77
 Thus, in the § 1122 approval process, the Secretary's role is that of assuring compliance with the carefully delineated statutory proceeding and entails no decision making once a favorable state finding is made. This conclusion as to the ministerial nature of the Secretary's role is consistent with the scant legislative history that is available. The purpose of § 1122 was to ensure that federal assistance to health care facilities was consistent with state and local health facility planning efforts. When the state has attested to this consistency there is no basis for the Secretary to reject that conclusion; Congress did not grant the Secretary authority to reject a favorable finding.[2]
 
 The majority states:
 
 78
 The commitment of the federal government to reimburse a hospital for patient care neither indicates a massive federal presence nor connotes "major Federal" action under NEPA. at 632.
 
 
 79
 It seems incredible to me to suggest that there is no massive federal presence here. As the majority has noted, in this case the § 1122 approval process entails reimbursements for an $88 million capital expenditure project. The district court apparently accepted the "substantiality" of the funds for this project:
 
 
 80
 The plaintiffs have estimated that bills submitted under medicare programs will initially include $3,000,000 per year that is attributable to the construction costs of Plan Omega which will not be fully depreciated for perhaps thirty years. Thus, as a practical matter at least from the viewpoint of the WMC, § 1122 approval by the Secretary was an essential link in the chain of events leading to the implementation of Plan Omega. 436 F.Supp. at 1199.
 
 
 81
 If massive federal presence were the sole criteria, an EIS statement should be filed, but, as I have noted, because the Secretary's role in this case was ministerial, it is unnecessary to reach the question of whether "major" federal action exists.
 
 
 
 [1]
 Comment, Scenic Rivers Association v. Lynn: The Effect of NEPA on the Interstate Land Sales Act, 124 U.Pa.L.Rev. 250 (1975) ("Comment, Scenic Rivers "), Quoting, Comm. on Interior and Insular Affairs, Report on National Environmental Policy Act of 1969, S.Rep. No. 296, 91st Cong. 1st Sess. 14 (1969). See 115 Cong.Rec. 40416 (1969) (remarks of Senator Jackson). The Council on Environmental Quality, which has been assigned by Congress the duty and function of reviewing activities of the federal government in light of NEPA, has confirmed Congressional intent, requiring all agencies "to build into their decisionmaking process . . . appropriate and careful consideration of the environmental aspects of proposed action." 40 C.F.R. § 1500.1(a) (1977)
 
 
 [2]
 Note, The Least Adverse Alternative Approach to Substantive Review Under NEPA, 88 Harv.L.Rev. 735 (1975)
 
 
 [3]
 Two other smaller hospitals in Wilmington provide 282 additional beds
 
 
 [4]
 Section 1122 of the Social Security Act was enacted to assure that the federal government would not reimburse hospitals serving medicare and medicaid patients unnecessarily for the portion of the patient's charge reflecting capital costs. The section was designed to encourage the states to curb unneeded capital expenditures for hospital facilities and thereby contain hospital costs. H.R.Rep. No. 92-231, Social Security Amendments of 1972, Reprinted in, 3 U.S.Code Cong. & Admin.News, pp. 4989, 5065 (1972)
 Section 1122 requires the states to determine if a capital expenditure, at a hospital receiving federal reimbursement for patient charges, is necessary under the applicant's state's policy. If a positive decision is reached, H.E.W. commits itself not to withhold the capital cost component of patient reimbursements. If the state reaches a negative decision, H.E.W. retains the power to accept the finding of no need, thereby not authorizing reimbursement of capital costs, or to reject the finding and assure capital cost recovery.
 
 
 [5]
 Section 1122 approval merely eliminates one possible ground for the reduction, but not the elimination, of medicare, medicaid, and child health payments. Additionally, approval does not guarantee that a hospital will continue to receive payments and they may be withheld, even if section 1122 approval has been received, if the health care provider does not comply with other requirements set by the Government
 
 
 [6]
 Apparently, WMC had decided that it would not pursue Plan Omega until it had received a section 1122 approval. However, even had it not received such an approval, there would have been no legal barrier to restructuring of its operations. Had WMC not applied for and been granted section 1122 review, it simply would have run the risk of not being reimbursed for the capital component costs of the services it provided to federally assisted patients
 
 
 [7]
 The district court indicated that as a result of this litigation WMC's effort to market its bonds and commence construction of its project was thwarted. The court stated that as a consequence of the delay, the costs of the plan were anticipated to increase substantially. N. A. A. C. P. v. Wilmington Medical Center, Inc., 426 F.Supp. 919, 922 (D.Del.1977)
 
 
 [8]
 In response to the agreement, plaintiffs requested the district court to declare the H.E.W. regulations embodied in its contract with WMC violative of due process of law in that plaintiffs were not given an "evidentiary hearing" on the issue of whether the relocation plan, as modified, was consistent with Title VI and the Rehabilitation Act. In an opinion dated June 21, 1978, the district court upheld the constitutionality of the new plan. N. A. A. C. P. v. Wilmington Medical Center, Inc., 453 F.Supp. 330 (D.Del.1978). The propriety of that ruling is not before us in the instant appeal
 
 
 [9]
 H.E.W. concluded that Plan Omega would have a substantial impact on the environment in five areas: (1) on the use of the land at the hospital site; (2) on the use of the land in southwestern New Castle County; (3) on the aquatic environment of the land adjoining the proposed hospital site; (4) on the population of the city of Wilmington; and (5) on the overall utilization of the land and resources of New Castle County
 
 
 [10]
 At first blush two jurisdictional impediments to our hearing this appeal might appear: (1) that plaintiffs as organizations representing minorities would not have standing to make a claim under environmental acts, and (2) that the district court's order granting partial summary judgment for the Government was not a final appealable order
 (1) The district court held that plaintiffs had standing because they had alleged that Plan Omega would cause them environmental harm and that that allegation placed them arguably within the zone of interests protected by NEPA. N. A. A. C. P. v. Wilmington Medical Center, Inc., 436 F.Supp. 1194, 1197 n.2 (D.Del.1977). Under Shiffler v. Schlesinger, 548 F.2d 96, 102-03 (3d Cir. 1977), this is sufficient to establish an organization's standing to press an environmental claim.
 (2) The district court had before it not only plaintiffs' NEPA claim but also their claims under Title VI and the Rehabilitation Act. The court's determination that NEPA does not apply to a section 1122 approval is therefore an interlocutory decision. The court, however, also determined that there was no just reason to delay entry of final judgment on the NEPA claim and it severed that issue from the others before it. It then certified the claim under Fed.R.Civ.P. 54(b) and entered final judgment. No one has questioned this exercise of discretion by the district court. We thus have jurisdiction over the judgment under 28 U.S.C. § 1291 (1970).
 
 
 [11]
 In making an EIS, the agency is also required to solicit the comments of any other agency having jurisdiction or expertise with respect to the environmental impact of the proposal. NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C) (1970). The agency is required, as well, to study alternative courses of action, recognize worldwide impact of the environmental problems of the proposal, make advice and information on enhancing the quality of the environment available to the states, utilize ecological information in planning and development, and assist the Council on Environmental Quality. Id., as amended, 42 U.S.C. § 4332(2)(E)-(I) (Supp. V 1975). Furthermore, state agencies or officials may be required to prepare the contents of the EIS in cases involving the exercise of sovereignty by both the state and federal governments. Id., as amended, 42 U.S.C. § 4332(2)(D) (Supp. V 1975)
 
 
 [12]
 The Council regulations provide in pertinent part:
 § 1500.6 Identifying major actions significantly affecting the environment.
 (c) . . . Section 102(2)(C) requires the preparation of a detailed environmental impact statement in the case of "major Federal actions significantly affecting the quality of the human environment." The identification of major actions significantly affecting the environment is the responsibility of each Federal agency, to be carried out against the background of its own particular operations. The action must be a (1) "major" action, (2) which is a "Federal action," (3) which has a "significant" effect, and (4) which involves the "quality of the human environment." The words "major" and "significantly" are intended to imply thresholds of importance and impact that must be met before a statement is required.
 
 
 [40]
 C.F.R. § 1500.6(c) (1977) (emphasis supplied)
 
 
 [13]
 Plaintiffs maintain on appeal that the district court erroneously held that the Secretary lacked discretion under section 1122 to withhold approval of a project on environmental grounds. They contend: (1) that the language of the statute demonstrates that the Secretary is "clearly vested" with discretionary power under the section; (2) that the statute obligates the state agency to make "recommendations" to the Secretary, indicating that H.E.W. must have residual power to disapprove a program; (3) that H.E.W. has discretionary power to set the standards for the designated state agency to consider in its review of proposed expenditures; (4) that the Secretary has discretionary power to rule on a motion to reconsider any action taken under section 1122; and (5) that the Secretary has clear power to overrule the state's recommendation on a disapproved application. We believe that none of these powers imputed by plaintiffs to the Secretary reveal any discretion to act on an Approved application. At best they demonstrate only that the role of the Secretary is limited to action on disapproved applications and to assure that proper procedure has been followed by the state agency. The statute and regulations are more articulate in their silence as to the Secretary's power than in the powers they express
 
 
 [14]
 The Secretary has conceded only that Plan Omega will affect the environment. It has consistently maintained that Its action under section 1122 is so attenuated and removed from the operation of Plan Omega that the adverse features of that plan cannot be attributed to H.E.W.'s action. The agency thus asserts that there is no nexus between its minimal federal action under section 1122 and the adverse environmental impact on the relocation plan. See infra
 
 
 [15]
 In each instance cited by Judge Wright in Scientists' Institute, the agency action was one which was an absolute legal condition precedent to the action which would affect the environment. In the instant case, there is no requirement that WMC obtain a section 1122 approval prior to undertaking Plan Omega. The district court instead found that the Center could undertake its relocation plan without any agency action at all. We need not, however, rest our decision on our view of agency action, for even if H.E.W.'s role constituted "action" under NEPA, its action was not "major."
 
 
 [16]
 The district court indicated that WMC, though not legally compelled apparently has conditioned implementation of Plan Omega on obtaining a section 1122 approval by the Secretary. The court also found that the Secretary did not deny that WMC would not go forward with Plan Omega "but for" the revenue derived from federal health care programs. N. A. A. C. P. v. Wilmington Medical Center, Inc., supra, 436 F.Supp. at 1199. This indicates no more than that the hospital might not successfully operate without reimbursement for services rendered to patients under various federal programs. Contrary to the conclusion drawn by the plaintiffs, it does not necessarily indicate that section 1122 approval was considered by the Secretary to be essential to WMC's implementation of the relocation plan. For purposes of this appeal, we assume that "but for" section 1122 approval Plan Omega could not be implemented, but we do not conclude that section 1122 approval is a predicate for the plan
 
 
 [17]
 We believe the instant case is distinguishable from Proetta v. Dent, 484 F.2d 1146 (2d Cir. 1973) and Silva v. Romney, 473 F.2d 287 (1st Cir. 1973). Both of these cases involved direct, though contingent, financial obligations on the part of the federal government. In Proetta, the government obligated itself to loan money to a private company for construction of a new facility. Although no funds had been expended, the court concluded that a "major Federal" action had taken place. Silva also involved a direct obligation on the part of the government a mortgage guarantee. The court concluded such action to be major, although the government did not oppose that characterization. Neither case involved holding a Tangential federal endorsement to be a major action. Given our view of the differences between major and minor action, we will not extend Proetta and Silva to the instant appeal
 We also do not believe that the attenuated relationship of section 1122 to federal action which reimburses health care providers for their care to patients under health care programs is sufficiently close to tie H.E.W.'s actions into a unitary program requiring the filing of an EIS. See Note, Program Environmental Impact Statements: Review and Remedies, 75 Mich.L.Rev. 107 (1976); Note, The Scope of the Program EIS Requirement: The Need for a Coherent Judicial Approach, 30 Stan.L.Rev. 767 (1978).
 
 
 [18]
 The Council on Environmental Quality regulations reinforce this conclusion. The regulations apply to "contracts, grants, subsidies, loans, or other forms of funding assistance." 40 C.F.R. § 1500.5(a)(2) (1977). However, they specifically exclude situations in which federal aid is distributed in a program such as revenue sharing, in which there is "no Federal agency control over the use" of the funds. Id. We believe that medicare, medicaid, and child health payments are analogous to payments under revenue sharing because the Secretary may not control their disbursal. Rather, he pays the hospital for its services to its patients under certain prescribed programs. The agency's decision as to allocation of those funds is controlled by the health care provider's costs and the agency is obligated to make payment except in narrow circumstances
 
 
 [19]
 In essence, we affirm the district court's judgment upholding the Secretary's decision not to file an EIS. The district court reviewed the Secretary's decision under a "reasonableness" standard under which agency action may be reversed if it is based on an unreasonable interpretation of NEPA. N. A. A. C. P. v. Wilmington Medical Center, Inc., supra, 436 F.Supp. at 1200
 Courts have differed on whether to follow the "reasonableness" standard, See, e. g., City of Davis v. Coleman, 521 F.2d 661, 673 (9th Cir. 1975); Minnesota Public Interest Research Group v. Butz, 498 F.2d 1314, 1320 (8th Cir. 1974); Wyoming Outdoor Coordinating Council v. Butz, 484 F.2d 1244, 1249 (10th Cir. 1973), or whether to follow the "arbitrary and capricious" standard, See, e. g., Nucleus of Chicago Homeowners Ass'n v. Lynn, 524 F.2d 225, 229-30 (7th Cir. 1975), Cert. denied, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); Chelsea Neighborhood Ass'ns v. United States Postal Service, 516 F.2d 378, 387 n. 23 (2d Cir. 1975). See also Note, Threshold Determinations Under Section 102(2)(c) of NEPA: The Case for "Reasonableness" as a Standard for Judicial Review, 16 Wm. & Mary L.Rev. 107 (1974).
 In view of our disposition of this case and our holding that the Secretary was not required, as a matter of law, to file an EIS for his section 1122 approval, we do not reach the appropriate standard of review as H.E.W.'s decision may be upheld under either standard. Cf. Shiffler v. Schlesinger, supra, 548 F.2d at 104-05 n. 5 (court avoids issue of standard of review in view of disposition of case on ground of laches).
 
 
 [1]
 Milo Community Hospital v. Weinberger, 525 F.2d 144 (1st Cir. 1975) (Secretary of HEW not required to file an EIS when decertifying a hospital for non-compliance with safety code because he had a statutory duty to close the hospital and had no discretion to take environmental factors into consideration); Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 496 F.2d 1017 (5th Cir. 1974) (Army Corps of Engineers had no jurisdiction to approve or disapprove state-financed expressway project; therefore, their action did not trigger NEPA provisions); Jones v. Lynn, 477 F.2d 885 (1st Cir. 1973) (HUD's retention of significant discretionary powers under pre-1970 contract could result in requiring EIS); Wilson v. Lynn, 372 F.Supp. 934 (D.Mass.1974) (HUD retained significant discretionary powers under mortgage insurance certificate, but no significant environmental impact shown); Carolina Action v. Simon, 389 F.Supp. 1244 (M.D.N.C.), Aff'd, 522 F.2d 295 (7th Cir. 1974) (Secretary of Treasury had no authority over dispersal of revenue sharing funds; therefore not required to file EIS when local community planned to use funds to construct buildings). In Scenic Rivers Assn. of Oklahoma v. Lynn, 382 F.Supp. 69 (E.D.Okla.1974), Aff'd in part, rev'd in part, 520 F.2d 240 (10th Cir. 1975), Rev'd on other grounds sub nom., Flint Ridge Dev. Co. v. Scenic Rivers, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976), the district court held that an EIS was required despite the fact that the Secretary of HUD was limited to reviewing disclosure statements filed under the Interstate Land Sales Act. The Secretary's reviewing authority was limited to checking for materially incomplete or inaccurate statements. Since the Supreme Court later held that NEPA is inapplicable to the Act, the lower court opinions are of questionable precedential value; nevertheless, here the Secretary's responsibility is more limited than that found in Scenic Rivers
 
 
 [2]
 Where a negative state finding is made, national interests could provide a basis for allowing reimbursement despite the inconsistency of the proposed facility with State and local plans. § 1122(d)(2). In such cases, the Secretary does exercise discretionary authority