WILMINGTON UNITED NEIGHBOR-
HOODS et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HEALTH, EDUCATION AND WEL-
FARE, et al., Defendants.

WILMINGTON MEDICAL CENTER,
INC., a Non-Profit Corporation of
the State of Delaware, Plaintiff,

v.

Joseph A. CALIFANO, Jr., as Secretary
of the Department of Health, Educa-
tion and Welfare, Defendant,

and

Wilmington United Neighborhoods,
Defendant-Intervenor.

Civ. A. Nos. 77–439, 77–480.

United States District Court,
D. Delaware.

Sept. 22, 1978.

Douglas Shachtman, Community Legal Aid Society, Inc., Wilmington, Del. and Marilyn G. Rose and Herbert Semmel, Center for Law and Social Policy, Washington, D. C., and Louise Lander, New York City, for plaintiffs in Civ. A. No. 77–439 and defendant-intervenor in Civ. A. No. 77–480.

Rodney M. Layton, William J. Wade and Alesia Ranney-Marinelli of Richards, Layton & Finger, Wilmington, Del., for defendants The Wilmington Medical Center, Inc., Crawford H. Greenewalt and Joseph A. Dallas in Civ. A. No. 77–439 and for plaintiff in Civ. A. No. 77–480.

James W. Garvin, Jr., U. S. Atty., Wilmington, Del., Barbara Allen Babcock, Asst. Atty. Gen., Barbara B. O'Malley and R. Joseph Sher, Trial Attys., Dept. of Justice, Washington, D. C., and Joan E. Kaehne, Asst. Regional Atty., Dept. of Health, Education and Welfare, Philadelphia, Pa., for Department of Health, Education and Welfare and its Secretary, defendants in Civ. A. Nos. 77–439 and 77–480, respectively.

Edward F. Kafader, Asst. Atty. Gen., Dept. of Justice, Dover, Del., for defendants Amos M. Burke, Director of the Bureau of Health Planning and Resources Development, and Robert H. Sweeney, Chairman of the Interim State Comprehensive Health Planning Council, in Civ. A. No. 77–439.

Michael D. Goldman and David A. Anderson of Potter, Anderson & Corroon, Wilmington, Del., for defendant Delaware Health Council, Inc., in Civ. A. No. 77–439.

### OPINION

LATCHUM, Chief Judge.

These actions represent another attempt by certain consumers of medical services in the Wilmington, Delaware metropolitan area to prevent the Wilmington Medical Center ("WMC") from implementing its controversial Plan Omega, which calls for the relocation of the bulk of WMC's urban hospital services to a suburban location.[1] On November 11, 1977, Wilmington United Neighborhoods, an association of Wilmington community groups, and eight individuals who are consumers of WMC's medical services (collectively "plaintiffs") instituted Civil Action No. 77–439 against the United States Department of Health, Education, and Welfare ("HEW"), the Delaware Health Council, Inc., and two state officials (collectively the "State defendants"), seeking to invalidate their approval of Plan Omega under section 1122 of the Social Security Act, 42 U.S.C. § 1320a–1 ("section 1122").[2] The effect of section 1122 approval is to assure a health care provider that Federal funds provided under medicare, medicaid, and programs for maternal and child health care services will not be reduced on the ground that the provider's capital expenditure program (Plan Omega in this case) was "unreasonable" or "unnecessary."[3] Plaintiffs allege that several of the actions taken by HEW and the State defendants in connection with the approval of Plan Omega violated the requirements of section 1122 and the regulations implementing it (42 C.F.R. Part 100). The complaint also asserts that defendants violated plaintiffs' right to equal protection by providing a "fair hearing" to proponents of a capital expenditure dissatisfied with the result of a section 1122 review, while denying disappointed opponents a similar opportunity to air their objections.

Plaintiffs later amended their complaint to add WMC as a defendant, alleging that it had violated its duties under section 1122 and the regulations implementing it by submitting unreliable financial data to the reviewing state agencies and entering into a construction contract that authorized costs far in excess of the figure that received section 1122 approval and postponed indefinitely commencement of construction.[4] With the exception of Delaware Health Council, Inc.,[5] all the defendants have moved to dismiss the amended complaint or, in the alternative, for summary judgment.[6] This opinion disposes of the issues raised by those motions and plaintiffs' motions for partial summary judgment against several of the defendants, which are also currently before the Court.[7]

---

1. WMC, which currently operates three hospitals within the City of Wilmington, is the major hospital system in northern Delaware. Plan Omega envisions the closing of two of WMC's hospitals and the construction of an 800-bed tertiary care facility (the "Southwest" Division) approximately eight miles southwest of Wilmington. For a more detailed description of Plan Omega, *see NAACP v. Wilmington Medical Center, Inc.,* 453 F.Supp. 280, 285–288 (D.Del.1978).

2. Docket Item 1.

3. *NAACP v. Wilmington Medical Center, Inc.,* 436 F.Supp. 1194, 1198 (D.Del.1977), aff'd, 584 F.2d 619 (C.A.3 1978).

4. Docket Item 9 (First Amended Complaint), pars. 15, 62–64.

5. By stipulation of the parties, the time within which Delaware Health Council, Inc., shall move, answer or otherwise respond to the complaint has been extended until after the Court determines the motion currently pending in this action. Docket Item 20.

6. Docket Items 8, 15 and 17. Defendants WMC and Amos M. Burke and Robert H. Sweeney, the two state officials, filed motions to dismiss only, but all of them have presented affidavits in support of their positions. *See* Docket Items 21 and 42. Because the Court has considered matters outside the pleadings, all the pending motions by defendants will be treated as motions for summary judgment. F.R.Civ.P. 12(b).

7. Plaintiffs have moved for summary judgment against HEW on their equal protection claim and on their claim that HEW's failure to make an independent review of Plan Omega constituted an abrogation of its duties under section

Under HEW's regulations, the section 1122 approval of Plan Omega was due to expire on December 15, 1977, unless on or before that date WMC incurred an obligation to build the project. On December 12, 1977, WMC filed an action against Joseph Califano, the Secretary of HEW (the "Secretary"), seeking declaratory and injunctive relief from the threatened expiration of the section 1122 approval.[8] Thereafter, Wilmington United Neighborhoods ("W.U.N."), a plaintiff in Civil Action No. 77–439, intervened as a defendant and by filing a counterclaim against WMC and a cross-claim against the Secretary asserted the same claims against those parties as it had in the first action.[9] WMC has moved to dismiss the counterclaim[10] and W.U.N. has moved for a partial summary judgment against WMC, declaring that the section 1122 certification of Plan Omega expired on December 15, 1977.[11] Because these motions and the motions pending in Civil Action No. 77–439 present virtually the same issues, the Court will dispose of them simultaneously.[12]

## I. BACKGROUND

### A. The Statutory Scheme

This is the second time the opponents of Plan Omega have asked this Court to invalidate its section 1122 approval. In *NAACP v. Wilmington Medical Center, Inc.,*[13] a different group of plaintiffs asserted that the approval was invalid because the Secretary had failed to prepare an environmental impact statement in conjunction with it as purportedly required by the National Environmental Policy Act of 1969 ("NEPA").[14] This Court rejected the plaintiffs' argument, holding that the Secretary reasonably had concluded that section 1122 approval did not constitute "major Federal action" within the meaning of NEPA. The Third Circuit Court of Appeals recently affirmed that decision.[15] In deciding the NEPA issue, both this Court and the Third Circuit reviewed the provisions of section 1122[16] and several of those provisions will be explored again in detail in the course of this opinion. Accordingly, only a brief overview of section 1122 and its implementing regulations will be provided at this juncture.

The express purpose of section 1122 is two-fold: (1) to assure that Federal funds for medicare, medicaid and maternal and child health programs "are not used to support unnecessary capital expenditures" for health care and (2) to "support planning activities with respect to health services and facilities in the various States." 42 U.S.C. § 1320a–1(a).

Under the statute the States retain primary responsibility for developing comprehensive local health planning programs and for assessing the need for proposed capital expenditures. State participation is voluntary, however. Interested States must enter into agreements with the Secretary of HEW, which designate a State planning agency ("DPA") to carry out the State's responsibilities under section 1122. 42

1122. Docket Item 28. Plaintiffs also seek summary judgment against WMC on the issue whether Plan Omega's section 1122 approval expired on December 15, 1977.

8. Civil Action No. 77–480, Docket Item 1. In this opinion the Secretary and HEW will be used interchangeably.

9. *Id.,* Docket Items 6 and 10.

10. *Id.,* Docket Item 13.

11. *Id.,* Docket Item 23.

12. Unless otherwise noted, all references hereafter to parties and pleadings will be in terms of Civil Action No. 77–439. Since the amount in controversy in each of these actions exceeds $10,000, the Court has subject matter jurisdiction over both of them under 28 U.S.C. § 1331.

13. 436 F.Supp. 1194 (D.Del.1977).

14. 42 U.S.C. § 4332(2)(C).

15. *NAACP v. Medical Center, Inc.,* 584 F.2d 619 (C.A.3 1978).

16. *See NAACP v. Wilmington Medical Center, Inc.,* 436 F.Supp. 1194, 1198–99 (D.Del.1977) and 584 F.2d 619 at 627–628 (C.A.3 1978).

U.S.C. § 1320a–1(b).[17]  On March 15, 1974, Delaware made such an agreement with the Secretary, designating the Bureau of Comprehensive Health Planning ("BCHP") of the Delaware Department of Health and Social Services [18] as its DPA.

The designated planning agency is charged with reviewing proposed capital expenditures to determine whether they are consistent with the standards or plans developed to meet the need for adequate health care facilities in the area of the State affected.  42 U.S.C. § 1320a–1(b). The DPA must consult with local health planning agencies interested in a particular proposal and submit to the Secretary the findings of those agencies with respect to the proposed expenditure together with the DPA's own findings and recommendations and any supporting materials deemed necessary by the Secretary.  *Id.*  The statute also requires the DPA to establish procedures for affording proponents of a capital expenditure found to be unnecessary "an opportunity for a fair hearing." 42 U.S.C. § 1320a–1(b)(3).

■ The function of the Secretary when a designated State planning agency has approved a proposed capital expenditure is severely limited.  As this Court stated in *NAACP v. Wilmington Medical Center, Inc., supra,* 436 F.Supp. at 1198:

> If [a section 1122] application has received complete approval when it reaches the Secretary, he then performs the ministerial act of assuring that the proper procedure has been followed. The Secretary, however, has no discretion as to whether the proposed expenditures are unwise. (Footnotes omitted).[19]

The statute does not authorize the Secretary to withhold Federal reimbursement for depreciation, interest on borrowed funds or other expenses related to a proposed capital expenditure that has received DPA approval, unless the Secretary determines that neither the DPA nor a local health planning agency had notice of the proposal at least sixty days before an obligation for it had been incurred.  42 U.S.C. § 1320a–1(d)(1)(A).

The Secretary has broader discretion with respect to expenditures found by the DPA to be inconsistent with the State or local health care facility needs or plans, and he may in certain special circumstances override the State's recommendation.[20]  It is unnecessary to consider the scope of that discretion in this case, however, because Plan Omega was approved by the planning groups concerned.

Finally, section 1122 provides that any person dissatisfied with a determination of the Secretary may request reconsideration within six months of such determination. The statute expressly precludes any other administrative or judicial review.  42 U.S.C. § 1122(f).

Against this background, the Court turns to the facts related to WMC's acquisition of section 1122 approval for Plan Omega.

### B.  *Facts*

For the most part, the facts in this litigation are undisputed.  WMC submitted an application for section 1122 approval of Plan Omega to the Bureau of Comprehensive Health Planning ("BCHP"), the DPA for Delaware, on March 19, 1976.[21]  A supplement to the application was filed on April 2, 1976, indicating an increase from

---

17. The Federal Government is authorized to pay the costs incurred by the designated planning agency ("DPA") in performing its duties under the statute. 42 U.S.C. § 1320a–1(c).

18. Docket Item 1, pars. 12 and 18.  Defendant Amos M. Burke is the Director of the Bureau of Health Planning and Resources Development, the successor agency to BCHP. *Id.* par. 12.  At all times relevant to the instant litigation, Burke was the Director of the DPA for Delaware. *Id.* pars. 34 and 35.

19. The Third Circuit agreed with this holding and quoted it with approval in affirming the NEPA decision. *NAACP v. Medical Center, Inc.; supra,* 584 F.2d at 628.

20. *See* 42 U.S.C. § 1320a–1(d)(2).

21. Docket Item 9, par. 23; Docket Item 22B, ex. F.

625,000 to 650,000 in the square footage of the proposed Southwest Division due to a decision to provide more private rooms and fewer semi-private rooms.[22] Immediately thereafter, the BCHP began its substantive review, utilizing the services of a statewide agency, the Interim State Comprehensive Health Planning Council ("Interim Council"),[23] and a local agency, the Health Planning Council, Inc. ("HPC").[24] Both these agencies reviewed Plan Omega for consistency with applicable standards, criteria and plans, and the Interim Council held public hearings on May 3, 4 and 5, 1976.[25] On June 3, 1976, the HPC "comment[ed] favorably" on Plan Omega as it had been submitted.[26] On June 9, 1976, WMC sent a letter to defendant Burke, indicating that the increase in square footage noted in the April 2 supplement would be slightly higher than estimated[27] and that the construction costs of the Southwest facility would be $2.3 million more than the figure given in the March 19 application. Nevertheless, WMC claimed in the letter that the total project cost would remain unchanged because of factors relating to the financing of the project.[28] On June 15, 1976, the Interim Council voted to approve Plan Omega and defendant Burke, acting on behalf of the BCHP, accepted the Council's recommendation and made a finding that the proposal was in conformity with the appli-cable standards, criteria and plans. The following day Burke executed HEW's form HRA–45, recording the DPA's finding and recommending that federal reimbursement not be withheld.[29]

In July, 1976, plaintiffs W.U.N. and Joseph G. DiPinto asked defendant Burke to permit them to contest the approval of Plan Omega at a "fair hearing" but he refused.[30] On August 6, 1976, defendant HEW, by the Acting Regional Health Administrator of Region III, approved Plan Omega for section 1122 purposes.[31]

On September 10, 1976, several organizations and individuals representing the poor, the elderly, the handicapped and various racial and ethnic minorities in Wilmington filed an action in this Court challenging Plan Omega under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[32] During the course of that litigation, the Court ordered HEW to investigate the claims that Plan Omega would violate those two statutes.[33] HEW's Office of Civil Rights ("OCR") conducted the investigation and in July 1977 announced its conclusion that "implementation of Plan Omega, as presently conceived, would violate Title VI and Section 504." The report further indicated that if WMC would agree to several substantial changes

---

**22.** Id.

**23.** Id. par. 13. Defendant Robert H. Sweeney was chairman of the Interim Council at all times relevant to this litigation. Id.

**24.** Id. pars. 18 and 28. Defendant Delaware Health Council, Inc. is the successor of the HPC. Id. par. 14.

**25.** Docket Item 21 (Affidavit of Amos M. Burke).

**26.** The HPC limited its approval to "Plan Omega, as submitted in the [section] 1122 application dated March 19, 1976, providing the total construction project cost does not exceed $73.5 million, plus or minus 5 percent. . . ." Docket Item 9, par. 28.

**27.** The June 9 letter estimated the square footage of the Southwest Division to be 659,000 instead of 650,000. Docket Item 22B, ex. F.

**28.** Id. Plaintiffs dispute this claim.

**29.** Docket Item 9, pars. 33 and 34; Docket Item 18, p. 8. Defendant Burke also sent a letter to WMC on June 16, 1976 notifying it that Plan Omega had been approved. Id.

**30.** Docket Item 9, par. 36.

**31.** Id. par. 37.

**32.** NAACP et al. v. Wilmington Medical Center, Inc., et al., 453 F.Supp. 280 (D.Del.). Although all the claims in Civil Action No. 76–298 have either been disposed of by way of summary judgment or withdrawn, several issues are still on appeal to the Third Circuit and the mere pendency of the action has served as a de facto injunction against WMC's proceeding with Plan Omega.

**33.** NAACP v. Wilmington Medical Center, Inc., 426 F.Supp. 919, 925 (D.Del.1977).

in the plan compliance could be achieved. Several months of negotiations ensued and on November 1, 1977 the Secretary entered into a Contract of Assurances with WMC in which WMC undertook, *inter alia*, to provide a transportation system for patients, visitors and employees between the remaining hospital in Wilmington and the Southwest Division; to institute a patient allocation system as to services available at both locations to preclude the development of racially differentiated utilization patterns; and to alter construction plans for both facilities to comply with the requirements of Section 504.[34]

Shortly after the Court ordered HEW to conduct its Title VI and Section 504 review of Plan Omega, plaintiffs in the case *sub judice* exercised their statutory prerogative [35] to request the Secretary to reconsider his August 6, 1976 determination to approve the project under section 1122. Eight months later, on September 7, 1977, Harold Margulies, M. D., Acting Administrator of the Health Resources Administration of HEW, notified plaintiffs that upon reconsideration HEW had decided to affirm its August 6, 1976 decision approving Plan Omega.[36] The decision on reconsideration, however, contained the following qualification: [37]

[C]ompliance with the July 5, 1977, findings of the Office for Civil Rights, Region III will alter the capital expenditures proposed [by WMC] sufficiently to require a new capital expenditure review under section 1122 of the Social Security Act.

This statement implied that if WMC agreed to make the modifications required to comply with Title VI and Section 504, it would have to submit the modified Plan Omega in its entirety to the BCHP for another section 1122 review.

However, on October 12, 1977, Dr. Margulies disavowed that interpretation in a letter to plaintiffs' counsel, stating: "To the extent that the Reconsideration may be so interpreted, it is inconsistent with the section 1122 program regulations." [38] Dr. Margulies expressed HEW's view that if changes were made in Plan Omega to satisfy OCR, those changes would be subject to section 1122 review only to the extent that any one or more of them amounted to a "capital expenditure" as defined by the regulations [39] and were deemed by the DPA to warrant review.[40]

WMC executed a Contract of Assurances with HEW's Office of Civil Rights on November 1, 1977. To date, none of the changes to Plan Omega specified therein have been submitted to the BCHP's successor agency for review.

Plaintiffs have asserted at least fifteen separate claims in this action challenging decisions made and procedures used at vir-

---

**34.** Docket Item 9, par. 46.

**35.** Section 1122(f) of the Act, 42 U.S.C. § 1320a–1(f). The request for reconsideration was filed on February 4, 1977 and supplemented on May 24, July 10, and August 30, 1977. Docket Item 9, par. 41.

**36.** Docket Item 9, par. 44. Dr. Margulies enclosed a seven page document entitled "Reconsideration of the Determination of the Acting Regional Health Administrator, Region III, on the Section 1122 Application of the Wilmington Medical Center, Inc., Wilmington, Delaware" in which he set forth the reasons for his decision to affirm the August 6, 1976 determination. Docket Item 22D, ex. F.

**37.** Docket Item 22D, ex. F., p. 7.

**38.** Docket Item 22D, ex. H.

**39.** The regulations define a "capital expenditure" as:

an expenditure . . . which, under generally accepted accounting principles, is not properly chargeable as an expense of operation and maintenance and which (i) exceeds $100,000, or (ii) changes the bed capacity of the facility with respect to which such expenditure is made, or (iii) substantially changes the services of th[at] facility. . .

42 C.F.R. § 100.103(a)(1).

**40.** Under the regulations, the DPA determines in the first instance whether a proposed expenditure is a capital expenditure within the meaning of section 1122. 42 C.F.R. § 100.-103(d). Moreover, in the context of a change in an approved capital expenditure, the DPA has discretion to exempt from review changes involving only cost. *Id.* § 100.103(a)(2)(v).

tually every step in the administrative process just described. All but two of those claims relate to alleged violations of section 1122, the regulations implementing it, or the agreement entered into by Delaware and HEW pursuant to the statute. The other two claims pertain to alleged violations of plaintiffs' constitutional right to equal protection. Because defendants have asserted threshold defenses relating to standing or reviewability with respect to all the statutory or nonconstitutional claims, the Court will discuss those claims first.

## II. THE STATUTORY CLAIMS

Plaintiffs claim that each of the defendants violated one or more of his duties under section 1122, the regulations, or the agreement between HEW and Delaware in connection with the review and ultimate approval of Plan Omega. Before addressing those claims, the Court notes that defendant WMC challenges the standing of the plaintiffs to assert the alleged violations. Specifically, WMC argues none of the plaintiffs has shown that he meets the following three requirements for standing: (1) the plaintiff must have been injured in fact by the challenged action;[41] (2) there must be a substantial probability that the

requested relief will alleviate the injury complained of;[42] and (3) the interests allegedly infringed must be "arguably within the zone of interests to be protected" by section 1122.[43] The parties briefed and vigorously contested the standing question. In light of the Court's conclusions on the merits of the plaintiffs' claims, however, it is unnecessary to decide whether any of the standing requirements have been met. Thus, for purposes of the pending motions the Court will assume standing.

### A. Claims Against HEW

At the risk of oversimplifying, plaintiffs have asked this Court to review substantive and procedural decisions made by HEW and the State defendants during the course of the section 1122 process with respect to three general areas: (1) the original approval of Plan Omega and the affirmance of that decision upon reconsideration; (2) the impact for section 1122 purposes of the modifications to Plan Omega made to achieve compliance with the civil rights laws; and (3) the sufficiency of the Gilbane Contract to meet the obligation requirement of the regulations. Defendants contend that section 1122(f), 42 U.S.C. § 1320a–1(f) precludes review of any of the decisions

---

**41.** *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 151–52, 90 S.Ct. 827, 25 L.Ed.2d 184 (1960). In this regard, the First Amended Complaint (Docket Item 9) was clearly deficient; except for an allegation that Alice Wilson suffered injury in her capacity as a member of the Delaware Health Council, Inc., the complaint contained no allegations of injury to any of the plaintiffs. *See* Docket Item 9, pars. 3–10. In order to rectify the situation, plaintiffs have moved to amend paragraphs 3 through 10 of the First Amended Complaint to allege that each of them has been injured by the actions of the defendants challenged in the complaint. Docket Item 32. Defendant WMC stated in its brief that it would oppose the proposed amendment but it has never advanced any reason for its objection. Docket Item 41, p. 10. Because the Court perceives no prejudice to the parties likely to result from the amendment, the motion to amend will be granted.

**42.** *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450

(1976); *accord, Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 260–61, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). It appears there are disputed issues of material fact with respect to whether the relief sought here—rescission of the section 1122 approval of Plan Omega and institution of a more rigorous review process—would deter WMC from building Plan Omega and thus alleviate the alleged injury to plaintiffs. *See* Affidavits of James P. Tyler, Docket Items 42 and 61; Affidavit of Jerome Pollack, Docket Item 57A. Consequently, even if it were necessary to decide this issue, which it is not, summary judgment would not be appropriate.

**43.** *See Warth v. Seldin*, 422 U.S. 490, 498–500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Sierra Club v. Morton*, 405 U.S. 727, 733, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Unlike the first two requirements, which derive from Article III of the Constitution, the zone of interest requirement is a prudential limitation imposed by the Supreme Court. *Warth v. Seldin, supra*, 422 U.S. at 499–500, 95 S.Ct. 2197.

challenged on nonconstitutional grounds.[44] Section 1122(f) provides:

> (f) Any person dissatisfied with a determination by the Secretary under this section may within six months following notification of such determination request the Secretary to reconsider such determination. *A determination by the Secretary under this section shall not be subject to administrative or judicial review.* (Emphasis supplied).

Although the language emphasized appears in clear and unequivocable terms to bar review by this Court of any determination made by the Secretary under section 1122, plaintiffs contend that the preclusion of review extends only to substantive determinations by the Secretary and not to procedural determinations. Thus, for example, plaintiffs seek to avoid the bar of section 1122(f) by challenging the Secretary's refusal to make an independent determination regarding the consistency of Plan Omega with applicable standards and plans, rather than the approval itself. In evaluating plaintiffs' argument, the Court must look to the legislative history and the purpose of section 1122.

The Administrative Procedure Act ("APA"), 5 U.S.C. § 701(a), authorizes judicial review of agency action except where "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." The Supreme Court has held that:

> "[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *A clear command of the statute will preclude review;* and such a command of the statute may be inferred from its purpose. . . . It is, however, "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent" that the courts should restrict access to judicial review.

*Barlow v. Collins,* 397 U.S. 159, 166–67, 90 S.Ct. 832, 838, 25 L.Ed.2d 192 (1970) (citations omitted) (emphasis supplied) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140–41, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).

The issue here is whether Congress intended to preclude review of all determinations by the Secretary under section 1122 or only substantive determinations, such as whether the proponent of an approved capital expenditure had notified the DPA about it at least sixty days before incurring an obligation. "[E]ach case raising an administrative reviewability question must be analyzed on the basis of the specific statutory provisions involved." *Briscoe v. Bell,* 432 U.S. 404, 414, 97 S.Ct. 2428, 2434, 53 L.Ed.2d 439 (1977). The language of section 1122(f) is uncomplicated and on its face exempts from review any "determination by the Secretary under [section 1122]." Nothing in the legislative history suggests that Congress meant to preclude review of "substantive" determinations only or to limit the reach of section 1122(f) in any other way. The House Ways and Means Committee, for example, simply paraphrased section 1122(f) in its section-by-section analysis of the bill that became the Social Security Amendments of 1972.[45] The only evidence of legislative intent offered by plaintiffs to support their construction of the statute is a statement made by former Secretary of HEW,

---

**44.** None of the defendants have argued that section 1122(f), which bars judicial review of a "determination by the Secretary under [section 1122]," precludes review of plaintiffs' constitutional claims. Moreover, the Supreme Court has construed similar statutory language as not precluding judicial review of decisions relating to the constitutionality of the underlying statute. *Johnson v. Robison,* 415 U.S. 361, 366–74, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *see Califano v. Sanders,* 430 U.S. 99, 109, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

**45.** The Committee Report stated:

> Subsection (f) of the new section 1122 provides that any person dissatisfied with a determination under the section may request reconsideration by the Secretary up to 6 months after notification, with such determinations not being subject to other administrative or judicial review.

H.R.Rep.No.231, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News, p. 5290.

Elliot Richardson, at a hearing before the Senate Finance Committee in 1970.[46] A single statement by an executive official made at a hearing two years before the enactment of section 1122(f) does not provide a sufficient basis for ignoring the plain language of the statute and inferring a Congressional intent to preclude review of substantive determinations only.

The Supreme Court's recent decision in *Briscoe v. Bell*, 432 U.S. 404, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1977), strongly supports the Court's conclusion that section 1122(f) absolutely bars judicial review of procedural as well as substantive determinations by the Secretary. In the *Briscoe* case, the Governor of Texas challenged actions by the Attorney General of the United States and the Director of the Census that led to a determination that Texas was subject to the 1975 Amendments to the Voting Rights Act. Under section 4(b) of the Act,[47] the Attorney General and the Director were responsible for determining whether specified preconditions for application of the Act to a particular jurisdiction were met. The Governor sought a declaratory judgment determining " 'how and under what circumstances the determinations . . . should be made.' " *Briscoe v. Bell, supra*, 432 U.S. at 407, 97 S.Ct. at 2430. He argued, *inter alia*, that the Attorney General failed to consider a required factor in making his determination and that the Director of the Census misinterpreted a clause of the statute.[48]

The Supreme Court was called upon to construe the following provision of section 4(b): "A determination or certification of the Attorney General or of the Director of the Census under this section  . . . shall not be reviewable in any court. . .." *Id.* at 408, 97 S.Ct. at 2430. For all practical purposes, the language is identical to that in section 1122(f). The District Court and the Court of Appeals construed the preclusion-of-review provision narrowly and found that they had jurisdiction to consider the "pure legal question" whether the officials had correctly interpreted the statute or had acted in a fashion "plainly in excess of [their] statutory authority." *Id.* Both courts then considered and rejected on their merits the Governor's procedural and statutory construction arguments. *Id.* at 409, 97 S.Ct. 2428. The Supreme Court, however, found the intent of Congress to preclude judicial review unmistakable and ordered dismissal of the complaint without reaching the merits, holding that "the courts below erred in finding that they had jurisdiction to review petitioners' claims of erroneous application of § 4(b)." *Id.* at 415, 97 S.Ct. at 2434.

Plaintiffs contend *Briscoe v. Bell* is distinguishable because it involved challenges to determinations by the Attorney General and the Director, while the instant case involves an attack on the Secretary's "failure to make any determinations or findings at all."[49] The Court disagrees. Plaintiffs' argument that the secretary had a statutory duty to make an independent review of Plan Omega before approving it was presented to the Secretary in the February 4, 1977 Request for Reconsideration.[50] The Secretary rejected the argument on the ground that section 1122 did not authorize him to make an independent judgment of

---

**46.** In response to a question from Senator Talmadge about the effect of a preclusion-of-review provision nearly identical to section 1122(f), former Secretary Richardson replied:

> [T]here is always an opportunity of going to a Federal court to seek to maintain the proposition that the Secretary has acted arbitrarily or beyond his authority. What this means, in effect, is that there is no judicial review strictly on the administrative basis of determinations made within the scope of the Secretary's discretion.

Proposed Amendments to the Social Security Act: Hearings on H.R. 17559 Before the Senate Comm. on Finance, 91st Cong., 2d Sess. 76 (1970).

**47.** 42 U.S.C. § 1973b(b).

**48.** 432 U.S. at 407 n. 6, 97 S.Ct. 2428. The Governor also argued that the Attorney General and the Director violated their statutory duties by failing to afford Texas a pre-determination hearing and by making an incorrect calculation with respect to applicability. *Id.*

**49.** Docket Item 30, pp. 19–20.

**50.** Docket Item 22B, p. 2.

the consistency of a DPA-approved capital expenditure with applicable standards, criteria and plans.[51] Thus, plaintiffs' claims are indistinguishable from the statutory interpretation claims held nonreviewable in *Briscoe v. Bell, supra.* And borrowing the language of Justice Marshall's conclusion in *Briscoe,* this Court concludes:

> [Section 1122(f)] could hardly prohibit judicial review in more explicit terms. . . . The language is absolute on its face and would appear to admit of no exceptions. The purposes and legislative history of [section 1122] strongly support this straightforward interpretation.

432 U.S. at 409–10, 97 S.Ct. at 2431.

The Court also considers *Thermtron Products, Inc. v. Hermandorfer,* 423 U.S. 336, 96 S.Ct. 584, 46 L.Ed.2d 542 (1976), a case cited by plaintiffs, inapplicable in the circumstances of this case. The *Thermtron* case involved 28 U.S.C. § 1447(d), which precludes review of a Federal Court order remanding a case removed from a State court back to the court from which it had been removed. The Supreme Court held that Congress did not intend to extend the prohibition against review beyond orders entered pursuant to 28 U.S.C. § 1447(c). *Id.* at 346, 96 S.Ct. 584. Therefore, the Court permitted review of an order based "on grounds wholly different from those upon which § 1447(c) permits remand." *Id.* at 344, 96 S.Ct. at 589; *see Briscoe v. Bell, supra,* 432 U.S. at 414 n. 13, 97 S.Ct. 2428. None of the actions or omissions alleged by the plaintiffs in the case *sub judice* are so

clearly outside the Secretary's statutory authority as to require consideration of the applicability of the *Thermtron* decision here.

Turning to the specific claims asserted against HEW, the Court concludes that section 1122(f) precludes a review of each of them. The first claim, that the Secretary had a duty to make an independent finding, has already been discussed. Plaintiffs also contend that the Secretary's October 12, 1977 determination that Plan Omega, as modified to comply with the civil rights laws, would not have to be reviewed again in its entirety under section 1122 violated the statute. As the October 12 letter to plaintiffs' counsel illustrates, however, the Secretary based his decision on his interpretation of the statute and the regulations implementing it.[52] The fact that HEW apparently had reached a contrary conclusion only a month earlier, or that the interpretation may be erroneous as a matter of law, or that the Secretary's decision may have been influenced by a letter from a business leader and personal friend of the President[53] is irrelevant, because in any of those events section 1122(f) would still preclude judicial review. *See Briscoe v. Bell, supra,* 432 U.S. at 409–15, 97 S.Ct. 2428.

Plaintiffs asserted no other statutory claims directly against HEW, but several of the claims against defendants Burke and WMC challenge actions that were either upheld by HEW upon reconsideration or taken by HEW in the first instance. Con-

---

**51.** Docket Item 22D, ex. F. Even if the Court were to reach the merits of the claims that the Secretary violated his duties under section 1122 by failing to conduct an independent review of Plan Omega either before approving it or, at least, upon reconsideration, the Secretary would be entitled to summary judgment. For, as previously stated, the Secretary's duties under section 1122 are severely limited when the state agency has approved a proposed capital expenditure and he has no discretion to overturn an approval by the DPA. *NAACP v. Wilmington Medical Center, Inc., supra,* 436 F.Supp. at 1198.

**52.** Docket Item 22D, ex. H. While the Secretary's interpretation of the applicable statutory and regulatory provisions may not be the only

possible interpretation, it is clearly not an unreasonable one.

**53.** Plaintiffs have alleged and vigorously argued that the Secretary reversed his decision regarding the effect of modifying Plan Omega to comply with the civil rights laws as a result of a letter he received on September 30, 1977, from Irving Shapiro, Chairman of the Board of the DuPont Company and allegedly a friend of the President. Docket Item 9, pars. 42 and 43. Even if this allegation were true and the Secretary did consider Mr. Shapiro's letter, he still would have been acting within his authority under section 1122 and therefore this Court would lack jurisdiction to review his determination under section 1122(f).

sequently, those claims raise additional issues of reviewability.

## B. Claims Against State Defendants

Plaintiffs' claims against the State defendants may be subdivided into two groups: substantive claims and procedural claims. The substantive claims charge that defendant Burke as Director of the DPA, defendant Sweeney as Chairman of the Interim Council, and defendant Delaware Health Council, Inc. as successor to the HPC, the local health planning agency involved, respectively, "acted in an arbitrary and capricious manner and in violation of § 1122" in approving Plan Omega because it "was in fact . . . inconsistent with applicable standards, criteria, and plans." [54]

■ At the outset, the Court notes that the decisions of the Interim Council and the HPC to recommend approval of Plan Omega are not final actions subject to judicial review, because they were only interim steps in the administrative process. The Supreme Court has stated: [55]

> [T]he relevant considerations in determining finality are whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action. *ICC v. Atlantic Coastline R. Co.,* 383 U.S. 576, 602 [86 S.Ct. 1000, 16 L.Ed.2d 109] (1966); *Rochester Telephone Corp. v. United States,* 307 U.S. 125, 143 [59 S.Ct. 754, 83 L.Ed. 1147] (1939).

Because the BCHP had full discretion to accept or reject the findings and recommendations of the Interim Council and the HPC,[56] those findings clearly were "advisory opinions" and did not determine any "right or obligation," so that "legal consequences" would flow therefrom. Thus, the Court holds that decisions by statewide and local health planning agencies assisting the DPA are not final decisions subject to judicial review. Accordingly, summary judgment will be entered against plaintiffs on their claim against Interim Council Chairman Sweeney and the Court also will enter judgment in favor of defendant Delaware Health Council, Inc. and against plaintiffs based on the law of the case.

With respect to the substantive claim against defendant Burke, the Court will assume arguendo that the DPA's approval of Plan Omega constituted final action for administrative review purposes. Before embarking on a review of the DPA's determination that the proposal was consistent with applicable standards and plans, however, the Court must decide whether Congress intended to preclude the Federal courts from reviewing actions by the DPA.[57] The initial inquiry is whether judicial review has been expressly precluded by statute—section 1122(f) in this case. Plaintiffs contend that section 1122(f) is inapplicable because it only precludes judicial review of "determination[s] by the Secretary." Since a decision of the DPA to approve a proposed capital expenditure is

---

**54.** Docket Item 9, pars. 54, 60 and 61. No other claims have been asserted against defendants Sweeney and Delaware Health Council, Inc.

**55.** *Port of Boston Marine Terminal Ass'n v. Rederiakliebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970).

**56.** *See* 42 U.S.C. § 1320a–1(b), (d); 42 C.F.R. §§ 100.104(a)(2)(i), (d); Docket Item 22E, Agreement, par. II.A(d).

**57.** The issue is phrased in terms of "prohibition" rather than "authorization" of judicial review because the Supreme Court has held that "judicial review of a final agency action by an aggrieved person will not be cut off unless

there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). In the circumstances of this case, the presumption of reviewability may not be applicable. Unlike the situation under the APA and the cases in which the Supreme Court has recognized the presumption, the instant case involves an attempt to obtain review of action by a State, rather than a Federal, agency. *Compare id.* and cases cited therein; 5 U.S.C. § 701(b)(1). In view of the clear legislative purpose to preclude review, however, the Court need not decide the issue.

binding on the Secretary, the Court will assume that such decisions are not preliminary actions to be integrated for review purposes into final determinations by the Secretary and that section 1122(f) does not expressly preclude judicial review of DPA approvals.

■ Absent express preclusion, nonreviewability may be inferred from a statute's purpose and its legislative history. However, courts should restrict access to judicial review only upon a showing of clear and convincing evidence that Congress so intended. *Barlow v. Collins, supra,* 397 U.S. at 167, 90 S.Ct. 832.

■ The legislative purpose behind section 1122 is limited and specific. Congress intended (1) to contain "hospital costs by limiting federal reimbursements covering capital expenditures for health care to those expenditures *deemed necessary by the state*" and (2) to encourage "rational health planning by the states." *NAACP v. Medical Center, Inc.,* 584 F.2d 619, at 627–628 (C.A.3 1978) (emphasis added), *aff'g* 436 F.Supp. 1194 (D.Del.1977).[58] The House Ways and Means Committee stated that the statute "would in no way change the autonomy or authority of existing State or local planning agencies."[59] In keeping with the purpose of section 1122 to support State and local health planning efforts, Congress left the primary responsibility for evaluating the merits of a proposed capital expenditure with the State agencies. Once the DPA approves a proposal, the Secretary's role is purely ministerial; he has no discretion to determine whether the proposed expenditure is unwise. The limited role of the Secretary under section 1122 clearly evinces

Congress' intent to avoid Federal[60] interference with substantive planning decisions made on the State and local level. Given the prohibition on judicial review of the Secretary's decision set forth in section 1122(f), it is inconceivable that Congress could have intended the Federal judiciary to play a more active role than the Secretary by reviewing under any standard the substance of the DPA's approval of a proposed capital expenditure. Thus, the Court discerns a clear Congressional intent to preclude judicial review of the BCHP's approval of Plan Omega on June 15, 1976 and will enter summary judgment in favor of defendant Burke on plaintiffs' claim that he acted in an arbitrary and capricious manner in approving the plan.

■ In addition to the substantive claims, plaintiffs charge that defendant Burke violated the requirements of section 1122, its implementing regulations, and Delaware's agreement with HEW in the following ways: (1) by failing to make an independent finding on behalf of Delaware's DPA, the BCHP, that Plan Omega was consistent with applicable standards and plans; (2) by failing to determine whether the modifications noted in the June 9, 1976 letter from WMC constituted a new capital expenditure subject to section 1122 review; (3) by failing to send HEW "copies of all comments from all parties participating in the review process at both local and State levels" when he notified the Secretary of the BCHP's approval of Plan Omega; and (4) by failing to require that Plan Omega as modified to comply with the findings of HEW's Office of Civil Rights

**58.** *See* 42 U.S.C. § 1320a–1(a).

**59.** H.R.Rep.No.231, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin. News, p. 5066.

**60.** The regulations and the agreement between HEW and Delaware pursuant to section 1122 recognize that judicial review may be available under State law or regulation to a proponent of an expenditure disapproved by the DPA. 42 C.F.R. § 100.106(c)(4); Docket Item 22E, Agreement, par. II.B3(d). Although plaintiffs contend this fact supports their position, the

Court considers it irrelevant. Nothing in the statute, regulations or agreement suggests that the availability of judicial review on the State level at the behest of a dissatisfied *opponent* of a proposal was ever contemplated. More importantly, judicial review by State courts of substantive decisions by the DPA is totally consistent with the legislative intent to have planning determinations made at the State and local level. Review of such decisions in Federal court, on the other hand, would directly contravene the purpose of section 1122.

undergo a new section 1122 review.[61] The first two of these "procedural" claims were submitted to HEW in connection with the Request for Reconsideration.[62] Because HEW considered and rejected both of those contentions in its September 7, 1977 Decision upon Reconsideration,[63] the Court concludes that it lacks jurisdiction to review either of them. This conclusion is based on the express preclusion of review contained in section 1122(f).

⬛ Likewise, plaintiffs cannot prevail on their claim that defendant Burke breached the agreement between Delaware and HEW under section 1122 by failing to submit copies of the comments and reports of the Interim Council and HPC to HEW along with the findings of those agencies and the DPA. Given the ministerial role of the Secretary with respect to proposed capital expenditures that have received DPA approval, submission of the reports of the subordinate State and local health planning agencies would be a useless act and a needless burden on both the DPA and HEW. While it is arguable, and the Court has assumed, that plaintiffs have suffered injury in fact as a result of the approval of Plan Omega under section 1122, there is no evidence that any of the plaintiffs was injured by defendant Burke's failure to send the comments and reports of the Interim Council and HPC to HEW. Because most if not all of those reports were in fact submitted to HEW in connection with the Request for Reconsideration[64] and the Secretary still affirmed the approval of Plan Omega, it is obvious that plaintiffs have not been injured by the challenged action. Accordingly, the Court finds that the plaintiffs lack standing to assert their third procedural claim against defendant Burke. *See Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 151–52, 90 S.Ct. 827, 25 L.Ed.2d 184 (1960).[65]

The final claim, which concerns the DPA's failure to require the entire plan Omega as modified to undergo a new section 1122 review, is closely related to another claim asserted against WMC. The two claims are discussed together in the next section of this opinion.

### C. *Claims Against WMC*

Plaintiffs have asserted three claims against defendant WMC, but only two warrant serious discussion.[66] They both pertain

---

61. Docket Item 9, pars. 53, 56, 57 and 58.

62. Docket Item 22B, pp. 5–6.

63. Docket Item 22E, ex. F, pp. 3–5. The Secretary found that the DPA had made the required findings and recommendation regarding Plan Omega. *Id.* pp. 3–4. As to the changes noted in the June 9, 1976 letter, the Secretary found that they did not necessitate additional review because the letter also indicated that the changes would not cause an increase in the total amount of the proposed capital expenditure submitted on March 19, 1976. *Id.* pp. 4–5.

64. *See* Docket Items 22B and 22C and exhibits attached thereto.

65. The claim based on defendant Burke's failure to transmit certain reports is based solely on the agreement between Delaware and HEW under section 1122; neither the statute nor the regulations require the DPA to submit such reports. The Secretary, therefore, clearly had the· authority to waive compliance with the alleged reporting requirement. It is clear from section 1122(f), and the general purpose of the statute that Congress did not intend the courts to become involved in the day-to-day procedures employed by HEW in administering section 1122. Consequently, even if plaintiffs had standing, the Court seriously doubts that it would have jurisdiction to entertain a claim based on an alleged technical breach of the agreement between Delaware and HEW. In view of its conclusion regarding standing, however, the Court need not reach this issue.

66. The Court finds no merit in the claim that WMC violated the requirements of section 1122 by submitting to the BCHP a preliminary financial report which it knew or should have known "was based on grossly unrealistic and untrustworthy assumptions as to projected revenues and costs." Docket Item 9, par. 62. The financial report submitted with the application for review of Plan Omega included the caveat that it was a "preliminary report" and "should not be used to assist in obtaining financing for the project." Docket Item 22B, ex. F. The assumptions upon which the projected financial statements were based were clearly identified. *Id.* Thus, the BCHP and other reviewing agencies had notice that the financial projections were only preliminary and chose to accept them anyway. There is no allegation that WMC deliberately withheld information availa-

to the requirement in the regulations (42 C.F.R. § 100.109(a)) that the proponent of an approved capital expenditure incur an obligation for it within, at most, eighteen months of the date it was approved by the DPA.[67] The BCHP approved Plan Omega on June 15, 1976. Under the regulations, WMC had one year from that date to incur an obligation for Plan Omega or suffer termination of the DPA approval. For good cause shown, however, the DPA was authorized to extend the period for incurring an obligation for up to an additional six months. WMC obtained a six-month extension from the BCHP in June 1977, giving it until December 15, 1977 to incur an obligation. On December 14, 1975, WMC entered into a contract with the Gilbane Building Company ("Gilbane Contract") for the construction of Plan Omega as modified to comply with the civil rights laws.

Plaintiffs assert two claims against WMC with respect to the Gilbane Contract. First, they contend that the Contract authorizes costs which are open-ended and far in excess of the costs approved by the DPA.[68] Second, plaintiffs argue that the Gilbane Contract does not satisfy the requirements of the regulations with respect to incurring an obligation for a capital expenditure and, therefore, that the BCHP's approval of Plan Omega has terminated.[69]

The former contention and the claim that defendant Burke had a duty to order Plan Omega as modified to undergo another section 1122 review raise questions concerning the procedure for handling changes to proposed capital expenditures made after approval has been obtained. Section 1122(g)

defines a "capital expenditure" for purposes of the statute as "an expenditure which . . . is not properly chargeable as an expense of operation and maintenance and which (1) exceeds $100,000, (2) changes the bed capacity of the [affected] facility . . ., or (3) substantially changes the services of the [affected] facility." 42 U.S.C. § 1320a–1(g); *see* 42 C.F.R. § 100.103(a)(1). The statute does not address the effect of changes in an approved capital expenditure, but the regulations do deal with the problem. The regulations provide that:

> Any change in a proposed capital expenditure which itself meets the criteria set forth in this paragraph, shall, for purposes of this subpart, be deemed a capital expenditure; *Provided,* That an increase or decrease in the cost of a proposed capital expenditure which increase or decrease is not related to a change in bed capacity or a substantial change in services may, at the option of the planning agency, be exempt from review under this subpart.

42 C.F.R. § 100.103(a)(2)(v). Furthermore, a determination by the DPA that a proposed expenditure or a change therein is not a capital expenditure within the meaning of the statute and regulations, or that it should be exempt from review or that it is otherwise not subject to section 1122 review is expressly made binding upon the Secretary by the regulations. *Id.* § 100.103(d). On the other hand, if the DPA determines that a change in a proposed expenditure is a capital expenditure, the proponent may appeal to the Secretary. *Id.*

ble to it or that it failed to provide information requested by the DPA.

**67.** The regulation provides in pertinent part: [W]here the designated planning agency has found that a proposed capital expenditure is in conformity with the standards, criteria, and plans described in § 100.104(a)(2), the obligation for such capital expenditure shall be incurred not more than one year following the date of such finding, or such shorter period as may be required by applicable State law: *Provided,* That in the absence of any State law to the contrary, the designated

planning agency may, pursuant to a showing of good cause by the person proposing such expenditure, extend the period during which such obligation must be incurred for up to an additional six months. If no such obligation is incurred within such period, the designated planning agency's approval shall, for purposes of this subpart, be deemed to be terminated upon the expiration of such period. 42 C.F.R. § 100.109(a).

**68.** Docket Item 9, par. 63.

**69.** *Id.* par. 64.

■ The essence of plaintiffs' claim against defendant Burke is that WMC's decision to alter Plan Omega to comply with the findings of the Office of Civil Rights so substantially changed Plan Omega that it gave rise to a duty on Burke's part to require the modified proposal to undergo a complete section 1122 review. Neither the statute nor the regulations explicitly imposes such a duty on the DPA or authorizes the DPA to vacate the approval of a capital expenditure on the basis of subsequent changes in the proposed expenditure. Moreover, in this case, the Secretary has considered the issue and rejected plaintiffs' position. In a letter to plaintiffs' counsel, dated October 12, 1977, Dr. Margulies explained HEW's position as follows:

Wilmington Medical Center has received approval, for purposes of the section 1122 review program, for Plan Omega. Plan Omega is a specific proposal to construct a new facility of a stated bed capacity to provide stated health services, as well as to remove certain services from the Delaware Division and to remodel that facility, at a given cost. To the extent that the capital expenditure actually made by Wilmington Medical Center deviates from Plan Omega in such a way that any of the three criteria set forth above is met, then reimbursement for amounts related to the capital expenditure which was not a part of Plan Omega may be withheld from payments to the facility. This applies equally to any capital expenditure which was not a part of Plan Omega and which results in the termination of a health service. If Wilmington Medical Center should in fact make such a change and not submit notice to the DPA in accordance with the requirement of [42 C.F.R.] § 100.106(a)(1), then the Regional Health Administrator, upon ascertainment of such non-compliance, will make a determination that timely notice (for that change) was not given. In that case, reimbursement related to the change in the capital expenditure will be withheld . . . . .

Docket Item 22D, ex. H, p. 3. In light of HEW's position, which under section 1122(f) is not subject to judicial review, it is clear that defendant Burke did not violate the statute or its regulations by failing to vacate the approval of Plan Omega in its original form.

■ For the same reasons, the fact that the costs of construction under the Gilbane Contract may exceed significantly the costs contained in the application for section 1122 approval presented to the DPA and the State and local health planning agencies on March 10, 1976 does not render the original approval of Plan Omega invalid. By incurring an obligation for more than the amount approved, WMC simply exposes itself to the risk that to the extent the capital costs related to Plan Omega exceed the amount originally approved, those costs will not be reimbursed from Federal funds. Section 1122 imposes no obligations on WMC in this regard; instead, it imposes conditions for obtaining a guarantee that Federal funds will not be withheld on the ground that WMC's capital expenditures were unnecessary or unreasonable. Accordingly, summary judgment will be entered in favor of WMC on plaintiffs' claim that it violated the cost containment policies of section 1122.

■ Plaintiffs' final statutory claim is that the BCHP's approval of Plan Omega expired on December 15, 1977 due to WMC's failure to incur an obligation for that capital expenditure within eighteen months of obtaining approval as required by the regulations.[70] Plaintiffs contend that the Gilbane Contract does not constitute an "obligation" within the meaning of section 1122 and its implementing regulations.

The regulations define an "obligation" for a capital expenditure, such as Plan Omega, as "an enforceable contract . . . for the construction, acquisition, lease or financing of a capital asset." 42 C.F.R. § 100.103(c)(1). Plaintiffs argue that the

**70.** *See* 42 C.F.R. § 100.109(a) set forth in note 67 *supra.* Plaintiffs moved for partial summary judgment against WMC on this issue. Docket Item 43.

Gilbane Contract is not such an obligation because it postpones the commencement of construction to an unspecified future date and gives WMC the discretion not to proceed at all. The argument is based on three clauses of the Gilbane Contract [71] which condition WMC's obligation to deliver a direction to commence work to Gilbane upon final resolution of the litigation relating to Plan Omega and WMC's receipt of financing. Under these clauses and subject to certain conditions that now appear to have been satisfied, WMC also has the right after July 1, 1978, to terminate the Contract unilaterally upon giving seven days written notice to Gilbane.

According to plaintiffs, the Gilbane Contract is so contingent in nature that it is illusory and unenforceable under general principles of contract law and within the meaning of HEW's regulations. To some extent, the Court shares the plaintiffs' concern that the Contract constitutes mere paper compliance with the regulatory requirements and that it tends to undermine the credibility of the section 1122 process. However, the Court is not convinced that it has the power to review the Gilbane Contract to determine whether it satisfies the regulatory requirement that an obligation be incurred within eighteen months of receiving DPA approval.

The procedures for section 1122 review established by the regulations in 42 C.F.R. Part 100 do not address the question: who determines whether a particular contract for a capital expenditure constitutes an "obligation" as defined in 42 C.F.R. § 100.-103(c). Likewise, there is nothing in the agreement or the DPA Manual regarding the issue. Nonetheless, the Court finds that the statutory and regulatory scheme gives rise to a strong inference that the DPA was intended to determine in the first instance whether a contract satisfies the obligation requirement and that at least proponents of a capital expenditure dissatisfied with the DPA's decision would be able to appeal to the Secretary.

In arguing that the Gilbane Contract does not constitute an "obligation," plaintiffs rely on two decisions by the Pennsylvania Department of Health,[72] terminating section 1122 approval for proposed capital expenditures because the construction contracts entered into by the proponent health care providers did not satisfy the obligation requirement of 42 C.F.R. § 100.109(a). One decision involved a sixty-bed Medicenter to be built in Oil City, Pennsylvania. The proponent obtained section 1122 approval for the project and in June 1976 (eighteen months later) forwarded a contract requiring, *inter alia*, commencement of construction within 120 days to the local health planning agency, which accepted it as a binding legal contract. In October 1976, however, the parties to the contract extended the required commencement date by about fifteen months without notifying either the local agency or the DPA. Upon being apprised of the amendment, the DPA made the following determination:

12.2.1 If on July 1, 1978, litigation pending against Owner or otherwise, whether instituted prior or subsequent to the date hereof, and affecting adversely Owner's ability to obtain financing for the Project upon terms and conditions deemed reasonable and prudent by Owner in its sole discretion, shall remain pending or shall have been resolved adversely to Owner, or if prior to such date Owner shall have been unable to obtain or obtain commitments for such financing then from and after July 1, 1978, Owner shall have the right to terminate the Contract by the giving of seven days prior written notice to CM. Docket Item 36A (Civil Action No. 77–480), ex. 3, pp. 13, 28–29.

---

**71.** The clauses read as follows:

5.2 CM [Construction Manager] shall commence the Work not later than thirty (30) days following the receipt by CM of Owner's written direction therefore. It is acknowledged by CM that (i) litigation pending at the date hereof has suspended the financing of the Project and (ii) Owner has advised CM that it anticipates final resolution of such litigation prior to July 1978. Prior to the receipt of Owner's direction to commence the Work CM shall incur no expenses payable by Owner hereunder.

5.3 *Promptly following the final resolution of the [litigation] and the receipt of the financing referred to in Section 5.2 hereof, Owner shall deliver to CM a written direction to commence work.*

**72.** Docket Item 36A (Civil Action No. 77–480), exs. 4 & 5.

[T]he October 8 amendment, signed 22 months after approval . . ., so substantially changed the contract and delayed project completion . . . that for purposes of Section 1122, the approval of [the] Project . . . lapsed on that date.[73]

In the second decision relied upon by plaintiffs,[74] the proponent of a capital expenditure had not given the DPA a contract for construction until several days after the eighteen-month time period had expired. In addition, the contract contained no specific date for commencement of construction and ten months after it was signed construction still had not begun. For these reasons, the Pennsylvania Department of Health decided that section 1122 approval for the capital expenditure had expired.

■ WMC argues that the Gilbane Contract is distinguishable from the contracts involved in the two Pennsylvania decisions, but it is unnecessary to decide that issue. The Court considers the decisions by the Pennsylvania Department of Health relevant to the instant case primarily because they support the conclusion that the DPA is the proper body to determine initially whether the regulatory requirement of an obligation has been met.[75] Nothing in the statute or regulations indicates that this Court is empowered to decide independently or to review decisions by the DPA or HEW as to whether the Gilbane Contract constitutes an "obligation." Thus, in the absence of any evidence to the contrary, the Court concludes that section 1122(f) precludes review of determinations by the Secretary or DPA in this area.[76]

To determine whether HEW had made a determination with respect to the obligation issue, the Court asked its counsel, Mr. Sher, at oral argument whether HEW had interpreted the term "obligation" or ruled on the Gilbane Contract. Mr. Sher responded that "after some considerable review of the matter . . . . [T]he position of HEW is that if the contract appears to be fair on its face, as [the Gilbane Contract] does, it is sufficient to satisfy the requirement of the regulation." [77]

In light of Mr. Sher's statement and the failure of the Delaware DPA to object to the Gilbane Contract, the Court finds that the Secretary has made a determination on this issue. Because section 1122(f) expressly precludes judicial review of determinations by the Secretary under section 1122, defendant WMC is entitled to summary judgment on plaintiffs' claim that the section 1122 approval of Plan Omega has expired.

## III. THE EQUAL PROTECTION CLAIMS

■ Lastly, plaintiffs have asserted two constitutional claims. Those claims revolve about section 1122(b)(3), 42 U.S.C. § 1320a–1(b)(3), which provides in relevant part:

(b) The Secretary . . . shall make an agreement with any State which is able and willing to do so under which a designated planning agency . . . will—

\* \* \* \* \* \*

(3) establish and maintain procedures pursuant to which a person *proposing* any such capital expenditure may . appeal a recommendation by the [DPA] and will be granted an opportunity for *a fair hearing* . . . .

---

**73.** Docket Item 36A (Civil Action No. 77–480), ex. 4, p. 2.

**74.** *Id.*, ex. 5 (Memo, dated March 20, 1978, re: Termination of an 1122 Approval for Witt Home for the Aging).

**75.** It is also noteworthy that in both instances the Pennsylvania Department of Health's determination was forwarded to HEW, suggesting the possibility of review by that agency. *Id.*, exs. 4 and 5.

**76.** Plaintiffs have attempted to circumvent the preclusion-of-review provision by asserting their claim against WMC instead of HEW or the State agencies. The Court will not permit plaintiffs to accomplish indirectly what the statute prevents them from doing directly and therefore holds that section 1122(f) governs this issue.

**77.** Transcript of Oral Argument ("Tr."), Docket Item 64, p. 108.

whenever and to the extent that the findings of such [DPA] . . . indicate that any such expenditure *is not consistent* with the [applicable] standards, criteria, or plans . . . . (Emphasis supplied).

The statute requires participating states to establish procedures by which the proponents of a capital expenditure may appeal adverse decisions by the DPA,[78] but it does not require the establishment of similar appeal procedures for opponents of proposals that have been approved. The HEW regulations and the BCHP procedures also provide an opportunity for a fair hearing only to unsuccessful proponents of an expenditure.[79]

Plaintiffs claim the Secretary's failure to accord opponents of a proposed capital expenditure the same appeal rights as proponents thereof constitutes a violation of their right to equal protection as guaranteed by the Due Process Clause of the Fifth Amendment.[80] Virtually the same claim has been asserted against defendant Burke, the director of the BCHP, under the Equal Protection Clause of the Fourteenth Amendment.[81] Plaintiffs admit that the classification at issue here does not impinge upon any "fundamental interest" or affect with particularity any "suspect class." Therefore, the test of constitutionality is whether the classification bears a rational relation to a legitimate state interest. *Ohio Bureau of Employment Services v. Hodory,*

431 U.S. 471, 489, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977); *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 312–14, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam); *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam). The Supreme Court examined a state classification under the rational basis standard in *Massachusetts Board of Retirement v. Murgia, supra,* and observed:

This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. . . . Such action by a legislature is presumed to be valid.

427 U.S. at 314, 96 S.Ct. at 2567 (footnote omitted).

In this case, the Court finds that the distinction drawn in the statute and the regulations and procedures implementing it between the hearing rights accorded to proponents and to opponents, like the plaintiffs, of a proposed capital expenditure is rationally related to a legitimate government interest served by section 1122. One purpose of section 1122 is to "avoid the use of Federal funds to support unjustified capital expenditures" by health care providers.[82] Congress sought to accomplish this objective by authorizing the Secretary to withhold reimbursements under medicare,

---

**78.** See section 1122(d)(1)(B)(ii), 42 U.S.C. § 1320a–1(d)(1)(B)(ii); H.R.Rep.No.231, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News, p. 5004.

**79.** There is a dispute concerning whether the statute actually precludes HEW and the DPA from affording consumer opponents of a proposed expenditure a fair hearing. Defendants contend that it does, while plaintiffs assert that both the Secretary and the DPA have discretion under the statute to provide such hearings. It is unnecessary to resolve that dispute, however, because in either case the Court finds that the classification drawn between proponent health care providers and opponent consumers is not violative of the plaintiffs' right to equal protection.

**80.** *Schneider v. Rusk,* 377 U.S. 163, 168, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964); *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98

L.Ed. 884 (1954). "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976).

**81.** Although the Amended Complaint appears to base this claim on the Due Process Clause of the Fourteenth Amendment as well as the Equal Protection Clause (Docket Item 9, par. 55), the plaintiffs have abjured any intention of asserting a due process claim against defendant Burke. Tr. at 41, 70–71; Docket Item 30, p. 34 (Plaintiffs' Memorandum of Points and Authorities).

**82.** H.R.Rep.No.231, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin. News, p. 5065; *see* 42 U.S.C. § 1320a–1(a).

medicaid, and maternal and child health programs to providers for depreciation, interest and other capital costs related to capital expenditures that are determined to be inconsistent with State or local health facility plans.[83]  Absent section 1122, health care providers like WMC would be entitled to reimbursement for their capital costs from Federal funds appropriated under medicare and the other programs mentioned.  A finding that a proposed capital expenditure is inconsistent with State plans and needs could cause a health care provider to be denied its entitlement to reimbursement from Federal funds.  Arguably at least, the affected provider would have a right under the Due Process Clause to a hearing before reimbursements to it were finally terminated.

The interests of health care consumers and others who might oppose a particular capital expenditure are much less tangible and substantial.  Indeed, plaintiffs admit their purported right to a hearing stems not from the deprivation of any interest protected by the Due Process Clause, but rather from the fact that Congress decided to accord hearing rights to health care providers.  Plaintiffs' argument rests on the premise that their interests are indistinguishable from those of providers.  Because the Court considers the interests under section 1122 of proponents of a disapproved capital expenditure to be at least arguably worthy of protection under the Due Process Clause while the interests of opponents of approved proposals do not appear to deserve such protection, plaintiffs' argument must be rejected.

Another basis for the distinction between proponents and opponents of a capital expenditure is the desire evident in both the statute and the implementing regulations to streamline the section 1122 review process and to avoid delaying the construction of needed facilities.  This concern explains Congress' decision to preclude judicial review of the Secretary's determinations pursuant to section 1122 and the Secretary's promulgation of a regulation (42 C.F.R. § 100.106(a)(4)) requiring the DPA to complete its review of an application within 60 to 90 days of receiving it.  If the Secretary fails to rule within the time frame allotted to him, the proposal is deemed approved for section 1122 purposes.  Providing proponents of an expenditure disapproved by a DPA with a fair hearing is not inconsistent with this objective, because there has been an initial finding that the proposed expenditure is *unnecessary.*  The same cannot be said with respect to according opponents of a DPA-approved proposal a right to a hearing.  Moreover, contrary to plaintiffs' contentions, the statute and regulations protect the interests of consumers in other ways.  For example, section 1122(b), 42 U.S.C. § 1320a–1(b), requires that every DPA have "a governing body or advisory board at least half of whose members represent consumer. interests." [84]  And, in this case at least, consumers and other opponents of Plan Omega had an opportunity to state their views on Plan Omega at several public hearings held by the Interim Council during the initial review period.[85]

For these reasons, the Court holds that defendants HEW and Burke are entitled to summary judgment on the constitutional claims asserted against them.[86]

## JUDGMENT

For the reasons stated in the Court's opinion entered on this date in this case, it is

ORDERED:

1.  The motion of the plaintiffs in Civil Action No. 77–439 ("plaintiffs") to amend

---

83.  H.R.Rep.No.231, *supra,* at 5065–66.

84.  The regulations contain the same requirement.  42 C.F.R. § 100.105(b).

85.  Three of the individual plaintiffs participated in those hearings.  Affidavit of Amos M. Burke, Docket Item 21.

86.  Since the Court has found that defendant Burke has not violated plaintiffs' rights under the Constitution or section 1122, he is entitled to summary judgment against the plaintiffs with respect to their claim against him under 42 U.S.C. § 1983 (Docket Item 9, par. 59).

the first amended complaint in that action pursuant to Rule 15(a), F.R.Civ.P., (Docket Item 32) is hereby granted.

2. The motion of defendant United States Department of Health, Education and Welfare ("HEW") in Civil Action No. 77–439 to dismiss or, in the alternative, for summary judgment (Docket Item 17) will be treated as a motion for summary judgment and is hereby granted in favor of defendant HEW and against plaintiffs on all the claims asserted against HEW in Civil Action No. 77–439.

3. Because in Civil Action No. 77–480 defendant-intervenor Wilmington United Neighborhoods ("W.U.N.") filed a cross-claim (Docket Item 10) against the defendant Secretary of HEW ("Secretary") asserting the same claims as plaintiffs had asserted against defendant HEW in Civil Action No. 77–439, and because summary judgment has been granted in favor of defendant HEW on the latter claims (¶ 2, *supra*), summary judgment is hereby entered in favor of defendant Secretary and against defendant-intervenor W.U.N. on its cross-claim in Civil Action No. 77–480.

4. The motion of defendants Amos M. Burke, as Director of the Bureau of Health Planning and Resources Development, and Robert H. Sweeney, as Chairman of the Interim State Comprehensive Health Planning Council, to dismiss (Docket Item 8) pursuant to Rule 12(b)(1) and (6), F.R.Civ.P., will be treated as a motion for summary judgment and summary judgment is hereby granted in favor of defendants Burke and Sweeney and against plaintiffs on all the claims asserted by plaintiffs in Civil Action No. 77–439 against those defendants.

5. Summary judgment is hereby entered in favor of defendant Delaware Health Council, Inc. and against plaintiffs on the claim asserted against that defendant by plaintiffs in Civil Action No. 77–439 based on the law of the case (*see* ¶ 4, *supra*).

6. The motion in Civil Action No. 77–439 of defendant Wilmington Medical Center, Inc. ("WMC") to dismiss (Docket Item 15) pursuant to Rule 12(b)(6), F.R.Civ.P., will be treated as a motion for summary judgment and summary judgment is hereby entered in favor of defendant WMC and against the plaintiffs with respect to all the claims asserted against WMC in that action.

7. The motion in Civil Action No. 77–480 of plaintiff WMC to dismiss (Docket Item 13) pursuant to Rule 12(b), F.R.Civ.P., the counterclaim asserted against it by defendant-intervenor W.U.N. will be treated as a motion for summary judgment and summary judgment is hereby granted in favor of plaintiff WMC and against W.U.N. on the counterclaim.

8. The motion of plaintiffs in Civil Action No. 77–439 for partial summary judgment (Docket Item 28) against defendants HEW and Burke with respect to the issues set forth below is hereby denied:

(a) Whether defendant HEW violated the Due Process Clause of the Fifth Amendment by adopting regulations that require designated State planning agencies under section 1122 of the Social Security Act (42 U.S.C. § 1320a–1) to provide a fair hearing to proponents of a disapproved capital expenditure but not to opponents of an approved expenditure;

(b) Whether the failure of defendant HEW to make an independent finding as to whether Plan Omega is consistent with applicable standards, criteria, and plans when it originally approved Plan Omega and its refusal to do so upon reconsideration constitute a violation of section 1122;

(c) Whether defendant Burke violated the Equal Protection Clause of the Fourteenth Amendment by denying the request of plaintiffs DiPinto and W.U.N. for a fair hearing on his purported findings that Plan Omega was consistent with applicable standards, criteria, and plans, while making fair hearings available to proponents of capital expenditures as to which negative findings had been made.

9. The motions of plaintiffs in Civil Action No. 77–439 (Docket Item 43) and defendant-intervenor W.U.N. in Civil Action No. 77–480 (Docket Item 23) for partial summary judgment against WMC on the

issue whether the approval of Plan Omega by the Bureau of Comprehensive Health Planning expired on December 15, 1977 are hereby denied.

10. In view of the fact that summary judgment has been granted in favor of WMC and against defendant-intervenor W.U.N. with respect to W.U.N.'s counter-claim in Civil Action No. 77–480 (¶ 7, *supra*), the motion of WMC to amend its complaint in Civil Action No. 77–480 (Docket Item 41) is hereby denied.

11. Since summary judgment has been granted on the cross-claim and the counter-claim advanced by W.U.N. in Civil Action No. 77–480 (¶¶ 3 and 7, *supra*), the only claims remaining to be adjudicated are those asserted by plaintiff WMC in the complaint in that action. Because the Court perceives no prejudice to any adverse party likely to result from the dismissal without prejudice of the remaining claims in Civil Action No. 77–480, the motion of WMC, the plaintiff in that action, for an order dismissing its complaint without prejudice (Docket Item 42), pursuant to Rule 41(a)(2), F.R.Civ.P., is hereby granted.

12. This Order shall constitute a final adjudication of all issues in the two above-mentioned actions.